The **CITY OF THORNTON, Acting By and Through its UTILITIES BOARD, Objector–Appellant/Cross–Appellee,**

v.

The **CITY OF FORT COLLINS, Applicant–Appellee/Cross–Appellant,**

and

the **Cache La Poudre Water Users Association, Northern Colorado Water Conservancy District, Saint Vrain and Left Hand Water Conservancy District, Colorado Water Conservation Board, the City of Greeley, the State Engineer and the Division Engineer, Water Division 1, and the Henrylyn Irrigation District, Objectors–Appellees.**

**No. 90SA514.**

Supreme Court of Colorado,
En Banc.

April 20, 1992.

Michael D. White, Bruce D. Bernard, Teri L. Petitt, White & Jankowski, Denver, for objector-appellant/cross-appellee.

Michael D. Shimmin, Douglas A. Goulding, Vranesh and Raisch, Boulder, for applicant-appellee/cross-appellant.

Jeffrey J. Kahn, Grant, Bernard, Lyons & Gaddis, Longmont, for objector-appellee Saint Vrain and Left Hand Water Conservancy Dist.

Gregory J. Hobbs, Jr., Bennett W. Raley, Julianne M. Cruise, Davis, Graham & Stubbs, Denver, for objector-appellee Northern Colo. Water Conservancy Dist.

Linda L. Preslan, Asst. Atty. Gen., Denver, for objectors-appellees Colo. Water Conservation Bd., State Engineer and Div. Engineer.

William H. Brown, Fischer, Brown, Huddleson & Gunn, P.C., Fort Collins, for objector-appellee Cache La Poudre Water Users Ass'n.

Justice MULLARKEY delivered the Opinion of the Court.

The City of Thornton (Thornton) appeals from a judgment of the water court for Water Division 1 (water court) awarding the City of Fort Collins (Fort Collins) a conditional surface water right with a certain appropriation date. Fort Collins cross-appeals from the judgment of the water court denying Fort Collins another conditional surface water right. As to the appeal, we affirm in part and reverse in part and remand. As to the cross-appeal, we reverse and remand.

## I

First, we review the applications by Fort Collins for conditional water rights and Thornton's objections. This case began when Fort Collins sought approval of conditional surface water rights along a segment of the Cache La Poudre River (Poudre River) which runs roughly from the northwest boundary diagonally toward the southeast boundary of Fort Collins. Fort Collins refers to that segment of the Poudre River as the Poudre River Recreation Corridor (Corridor). The Corridor is comprised of several parks, open space areas and trail systems. With the development of the Corridor, Fort Collins has enhanced the recreational opportunities and preserved the piscatory and wildlife resources of the Poudre River for the enjoyment of the residents of and visitors to Fort Collins.

The application for the Poudre River water rights was filed with the water court on December 31, 1986, pursuant to the Water Right Determination and Administration Act (Act), §§ 37–92–101, *et seq.*, 15 C.R.S. (1990). The 1986 application claimed 55 cubic feet per second (55 cfs) of Poudre River water for the Corridor "for municipal purposes, including recreational, piscatorial, fishery, wildlife, and other beneficial uses." The appropriation was claimed as of February 18, 1986, the date when the Fort Collins city council formally adopted the Poudre River Trust Land Use Policy Plan (Plan). The Plan outlines the various projects to be developed in the downtown section of the Corridor.

The Corridor was the named "diversionary structure" in the 1986 application. In addition to identifying the structure, the appropriation date and the amount and uses of water, the 1986 application also stated in relevant part:

No diversions from the [Poudre] river are anticipated [¶ 3.A.].

\* \* \* \* \* \*

Construction and planning is underway for a system of trails along the river, development of a fishery through [the Corridor], preservation and enhancement of wildlife habitat and aquatic life, as well as other public purposes. The existence of in-stream flows of water up to the amounts specified above, undiminished in both quantity and quality, are necessary to fulfill the purposes of the Recreation Corridor [¶ 7.B.(i)].

\* \* \* \* \* \*

[T]he uses will take place in the streambed ... [¶ 8.B.].

\*    \*    \*    \*    \*    \*

Since no diversions from the Poudre River are necessary to accomplish the actual and intended beneficial uses described above, Fort Collins specifically requests that the Court confirm these ... conditional water rights as in-stream rights, without the necessity for making any diversion from the river channel; [and] that the Court find that all of the uses described above are beneficial uses of water.... Additionally, Fort Collins requests a determination that all of these conditional rights are part of an integrated plan by the City to provide for ... recreational ... uses within the [Corridor], and that work on any part of this plan constitutes work on the entire plan for the purpose of subsequent diligence proceedings [¶ 9.].

A statement of opposition to this 1986 application was filed by Thornton on February 24, 1987. Other parties, including the Colorado Water Conservation Board (CWCB) and the state engineer, also filed objections. The objections were largely based on the claim or impression that Fort Collins was applying for minimum stream flow rights contrary to law.

After negotiations with the CWCB and the state engineer, Fort Collins agreed to amend its 1986 application. The settlement with the CWCB included certain stipulations and a proposed decree. The amendments were filed with the water court on June 1, 1988. According to the introductory remarks to these 1988 amendments, the amendments were generally "intended to narrow the scope of and to clarify" the 1986 application and were "consistent with and intended to relate back to the filing" of the 1986 application.

In particular, the 1988 amendments deleted the Corridor as the named diversionary structure, substituting therefor two specific diversionary structures within the Corridor, namely, the Fort Collins Nature Center Diversion Dam (Nature Dam) and the Fort Collins Power Plant Diversion Dam (Power Dam). The Nature Dam is a relatively new structure designed and built to divert the Poudre River back into its "historic" channel and away from a channel cut after heavy rains and flooding in 1983–84. Along the historic channel, Colorado State University (CSU) owns and maintains property slated for development as the Northern Colorado Nature Center. The Nature Center offers an interpretive trail system and picnic grounds for day use. Future plans include an arboretum and the relocation of the CSU raptor rehabilitation program to the Nature Center. Fort Collins and CSU cooperate with regard to the Nature Center and the continued development of the historic channel. Construction of the Nature Dam began after 1986 but was completed before trial to the water court. The Power Dam is an older structure on the Poudre River owned and maintained by Fort Collins. The Power Dam is so named because of its proximity to a retired municipal power plant which has received local historical designation. The old plant and the Power Dam are in the midst of numerous parks, a visual arts center and a community center, all integral to the Corridor. Other, valid appropriations of Poudre River water not at issue in this case are effected by Fort Collins at the Power Dam. Recently, Fort Collins renovated the Power Dam by strengthening the structure itself and by adding a boat chute and a fish ladder designed for recreational use and piscatorial preservation respectively.

The relevant provisions of the 1988 amendments are the following:

The legal description of the stream segment designated [in the 1986 application as the Corridor] has been narrowed to two individual points of diversion, ... [i.e., the Nature Dam and the Power Dam] [¶ 2.].

\*    \*    \*    \*    \*    \*

Fort Collins has formulated the intent and taken overt action to create the ... Corridor within which Fort Collins will construct diversion structures and use water within the Cache La Poudre River for municipal purposes, including recreational, piscatorial, fishery, wildlife, and

other beneficial uses. Construction and planning is underway for a system of trails along the river, diversion structures within the river, development of a fishery, preservation and enhancement of wildlife habitat and aquatic life, as well as other public purposes [¶ 5.A.].

\* \* \* \* \* \*

Fort Collins has already initiated construction of the [Power Dam,] ... which includes a boat chute for recreational use, and a fish ladder for piscatorial purposes. This diversion structure will be used to control and regulate the flow of the Poudre River to implement the intended beneficial uses of water. Additionally, Fort Collins is designing and plans to construct the [Nature Dam]. It will be a dam across the Poudre River which will divert water from the current river channel (carved during the 1983 and 1984 run-offs) back into the historic river channel adjacent to the dam.... This diversion structure will control and regulate the flow of the Poudre River to implement the intended beneficial uses of water [¶ 5.B.].

[The 1986] Application is amended ... by withdrawing the reference to "in-stream rights," since the definition of these rights by stream segments has been narrowed to two individual points of diversion.... At all times since the date of appropriation ... [the] purpose was to divert, as defined by statute, within the river's natural course or location, or otherwise capture, possess and control water for the described beneficial uses [¶ 7].

The 1988 amendments claimed 55 cfs of Poudre River water for the Nature Dam and 55 cfs for the Power Dam, both with appropriation dates of February 18, 1986, the same appropriation date for the 55 cfs of water for the Corridor in the 1986 application.

Due to the changes made by the 1988 amendments, most of the statements of opposition to the 1986 application were withdrawn. Thornton, however, along with the Northern Colorado Water Conservancy District (NCWCD), timely filed supplemental statements of opposition, objecting to

the 1988 amendments. In its supplemental statement of opposition, Thornton claimed that its water rights might be injured by granting the application. Thornton asserted that before the water court could decree a conditional water right, Fort Collins must prove that the waters sought to be appropriated can and will be diverted, stored, or otherwise captured, possessed, and controlled, and are not a thinly disguised minimum stream flow. Thornton further asserted that Fort Collins must prove that those waters will be applied to beneficial uses, that it had a fixed intent to divert and beneficially use those waters on February 18, 1986, and that it took overt acts sufficient to provide notice of that intent. Finally, Thornton asserted that Fort Collins must prove that the water rights sought in the 1988 amendments can be reconciled with the water rights sought in the 1986 application. That unappropriated Poudre River water is available is not disputed.

Although the NCWCD was a party below, Thornton and Fort Collins were the only parties which participated at trial to the water court in August, 1990. Here, the NCWCD urges affirmance of the water court on both the appeal and the cross-appeal. In its judgment and decree, the water court determined that the 1988 amendments related back to the 1986 application. The water court also found that Fort Collins had provided notice of its intent conditionally to appropriate Poudre River water and that this intent was shown by overt acts, particularly by the formal adoption of the Plan by the Fort Collins city council. The water court found that the water appropriation at the Nature Dam was a diversion and not a minimum stream flow and decreed Fort Collins a conditional Poudre River water right of 55 cfs with an appropriation date of February 18, 1986. However, the water court found that the water appropriation at the Power Dam was not a diversion, but a minimum stream flow, and thus did not decree a conditional Poudre River water right for the Power Dam.

Thornton appeals the water court's award of a conditional water right to Fort

Collins for the Nature Dam, and Fort Collins cross-appeals the water court's denial of a decree for its claimed conditional water right for the Power Dam.

## II

In its appeal, Thornton makes three basic arguments: first, that the 1988 amendments cannot relate back to the 1986 application; second, that the evidence presented by Fort Collins does not support an appropriation date of February 18, 1986; and third, that the Nature Dam is not a diversion within the meaning of the law. For these reasons, according to Thornton, the water court erred in awarding Fort Collins a conditional Poudre River water right for the Nature Dam with an appropriation date of February 18, 1986. We take each of Thornton's arguments in turn.

## A

In support of its argument that the 1988 amendments cannot relate back to the 1986 application, Thornton offers two grounds. First, Thornton asserts that the 1988 amendments substantially differ from the 1986 application because the 1986 application sought a minimum stream flow with no diversions while the 1988 amendments sought the converse, namely, two precise diversions with no minimum stream flow. Because of this difference, Thornton adds, no reasonably prudent person can be charged with notice that the water rights claimed in the 1986 application were or could ever be the water rights claimed in the 1988 amendments. Second, Thornton asserts that the 1986 application was patently unlawful because it was an application for a minimum stream flow, contrary to section 37–92–102(3), 15 C.R.S. (1990). In effect, Thornton argues that an amendment cannot relate back to an unlawful application.

For its part, the water court, in deciding that the amendments related back to the original application, did note that the 1988 amendments differed from the 1986 application in that the 1986 application stated that there would be no diversions while the 1988 amendments stated that in fact there

would be two discrete diversions. Nonetheless, the water court compared the amendments with the original application and found that the applicant was the same, that the source, amount and uses of the water were the same, and that the Nature and Power Dams were structures within the confines of the Corridor. The water court concluded that the 1988 amendments did not expand, but actually narrowed, the 1986 application and that therefore the amendments related back to the original application.

■ In *United States v. Bell*, 724 P.2d 631 (Colo.1986), we held that the issue of relation back in water adjudications is governed by the requirements of C.R.C.P. 15(c) so long as those requirements are not inconsistent with procedures provided in the Act. 724 P.2d at 635–636. The requirements of C.R.C.P. 15(c) are essentially notice requirements. Transposing the requirements to a water dispute under the Act, for an amendment to relate back to the date of an original water application, the claim(s) in the amendment must arise "out of the conduct, transaction, or occurrence set forth in the original" application. *See* C.R.C.P. 15(c). Because notice is the essential requisite for a relation back, we hold that since the source, amount and uses of Poudre River water claimed by the 1988 amendments were the same as in the original application, the 1988 water claims are claims arising out of the conduct, transaction or occurrence set forth in the 1986 application.

■ In *Bell*, the dispositive factor was the source of the water claimed. We denied a relation back in that case because the water source designated in the amendment was different from the water source designated in the original application. 724 P.2d at 639. Because the source of the claimed water differed, no notice was provided by the original application to parties with interests in the water from the new source designated in the amendment. *See Park Center Water Dist. v. United States,* 781 P.2d 90, 97–98 (Colo.1989). Here, in contrast, there is no significant disparity

between the 1986 application and the 1988 amendments as to the named source of the water. The water source named and legally described in the 1986 application was that segment of the Poudre River known as the Corridor. The water source named and legally described in the 1988 amendments was the Poudre River at specific points within the Corridor. Thus, the effect of naming the Corridor as the source of the water claimed in the 1986 application was not only to place those parties with interests or potential interests in that segment of the Poudre on notice but also to place those parties with interests or potential interests in specific points within that segment of the Poudre on notice. That the latter were placed on notice is indicated by the fact that no new parties filed statements of opposition to the 1988 amendments. All interested parties were alerted by the 1986 application, and the fact that the notice was perhaps overinclusive is not a defect.

Thus, Thornton's argument, that the conceptual difference between a minimum stream flow with no diversions and two discrete diversions with no minimum stream flow precludes a relation back, is not persuasive. Even assuming that a minimum stream flow is of an entirely different legal character than a diversion, it is possible nonetheless that one can be put on notice of another's intent to appropriate a definite amount of water from a sufficiently definite source even when the claimed water right is artlessly or even impermissibly characterized as a minimum stream flow rather than a diversion. *Cf. Board of County Comm'rs v. Collard*, 827 P.2d 546, 552 (Colo.1992) (when published resume notice suggests that the " 'applicants were seeking to appropriate substantial flows of various segments of the named streams, [such] fact alone would raise a red flag (inquiry notice) to any person interested in water in the subject streams' "); *Closed Basin Landowners Ass'n v. Rio Grande*, 734 P.2d 627, 633 (Colo.1987) ("The concept of the Closed Basin Project was not the appropriation of water from many discrete points, but a diversion of water from the entire area. The content of the published resume gave reasonable notice that the points of the proposed diversion would consist of the entire area...."); *City and County of Denver v. Colorado River Water Conservation District*, 696 P.2d 730, 751 (Colo.1985) ("an absence of a precise location [of points of diversion] does not automatically preclude a conditional decree. A would-be appropriator must give some notice to others of the claim upon the water from a particular source to establish a conditional water right; locating the diversion points with absolute specificity is not required."). Viewed as a reasonably prudent party, Thornton " 'ought to have been able to anticipate or should have expected that the character of the original pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question.' " *Bell*, 724 P.2d at 638 (quoting 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1497 at 498–99 (1971)).[1]

We conclude that Thornton was on notice, as of at least December 31, 1986, that Fort Collins intended to appropriate 55 cfs of Poudre River water from within the established limits of the Corridor for municipal, recreational and piscatory purposes. We thus reject Thornton's second ground in support of its argument that the 1988 amendments cannot be found to relate back to the 1986 application, namely, that the 1986 application was of dubious legality. An allegation that a claim for a conditional water right is illegal because it claims a minimum stream flow speaks to the issue of whether the right claimed should be granted at all, not to the sufficiency of notice upon which depends the issue of relation back. *See* Part II C. We hold that the water court properly found that the 1988 amendments relate back to the 1986 application.

---

**1.** In *Bell*, we noted that C.R.C.P. 15(c) was identical to Fed.R.Civ.P. 15(c), making commentary on the federal rule relevant.

924

## B

Thornton also disputes the appropriation date of February 18, 1986, decreed by the water court for the conditional water right at the Nature Dam. The water court found that the adoption of the Plan by the city council of Fort Collins at a public meeting on February 18, 1986, was an act sufficiently overt to place all interested parties on notice that Fort Collins intended to appropriate the Poudre River water claimed by the 1986 application. The water court ruled that the Plan's adoption satisfied both prongs of the so-called "first step" test for an appropriation of a conditional water right. The water court also found that the field trips by Fort Collins staff to the proposed sites for the Nature Center and power plant dams in February of 1986; the publication of notice of Poudre River water rights claims in a Fort Collins newspaper on December 31, 1986, and the signs posted at certain locations along the corridor on December 31, 1986, satisfied the overt acts prong of the first step test.

Thornton argues that neither the adoption of the Plan by the Fort Collins city council on February 18, 1986, nor the staff field trip in February, nor the posting of signs along the Corridor in December of 1986, nor the notices published in the local newspaper in December of 1986, whether taken singly or cumulatively, could constitute evidence sufficient to support an appropriation date of February 18, 1986. According to Thornton, these acts did not manifest a fixed intent to appropriate water at the Nature Dam as of February 18, 1986, nor did they constitute acts sufficiently overt to qualify as the first step taken toward the appropriation of water at the Nature Dam on February 18, 1986. Rather, the earliest possible appropriation date, according to Thornton, is June 1, 1988, the date on which the 1988 amendments were filed with the water court.[2]

## 1. The First Step Test.

We review the principles governing the adjudication of a conditional water right. In particular, we review the principles of the "first step" test and some of the sequential and evidentiary problems encountered in applying the test. The sequential problems are generated by the division of the first step into an intent prong and an overt act(s) prong. *See Lionelle v. Southeastern Colorado Conservancy Dist.*, 676 P.2d 1162, 1168 (Colo.1984). Such problems are further complicated by the requirement that the overt act or acts must perform at least three functions. *See Bar 70 Enterprises, Inc. v. Tosco Corp.*, 703 P.2d 1297, 1307 (Colo.1985). Evidentiary problems arise over whether a relevant act can be deemed to have performed one or more of the required functions.

■ A conditional water right is defined by the Act as "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6), 15 C.R.S. (1990). A conditional water right "encourage[s] development of water resources by allowing the applicant to complete financing, engineering, and construction with the certainty that if its development plan succeeds, it will be able to obtain an absolute water right." *Public Service Co. v. Blue River Irrigation Co.*, 753 P.2d 737, 739 (Colo.1988). We have held that "[c]onditional water rights decrees are designed to establish that the 'first step' toward an appropriation of a certain amount of water has been taken and to recognize the relation back of the ultimate appropriation to the date of that first step." *City of Aspen v. Colo. River Water Conservation Dist.*, 696 P.2d 758, 761 (Colo.1985). *See* § 37–92–305(1), 15 C.R.S. (1990).[3] To establish the date of the appropriation, the applicant

---

**2.** Actually, as Thornton notes, May 27, 1988, was the date the 1988 amendments were filed. June 1, 1988, is the date cited by the water court and Fort Collins, and since Fort Collins accepts the later date on this appeal, we will employ that date for the 1988 amendments for purposes of this opinion.

**3.** The relation back to the first step for purposes of determining the appropriation date is different from the relation back of amendments to an original application discussed in Part II A.

must show the "concurrence of the intent to appropriate water for application to beneficial use with an overt manifestation of that intent through physical acts sufficient to constitute notice to third parties." *City of Aspen*, 696 P.2d at 761.[4] The concurrence of intent and overt acts qualifies as the first step toward an appropriation of water, and the date on which the first step is taken determines the date of the appropriation.

The division of the first step into an intent prong and an overt acts prong has generated disputes over whether there is a necessary sequence of intent formation followed by overt acts. In *Bar 70*, we held that "[a]lthough the formation of the intent to appropriate water will generally precede the performance of the overt acts, the 'first step' in some cases may be completed even though the overt acts occur before the formation of the requisite intent to appropriate." 703 P.2d at 1307 (citing *Harvey Land & Cattle Co. v. Southeastern Colorado Water Conservancy Dist.*, 631 P.2d 1111 (Colo.1981); *Twin Lakes Reservoir & Canal Co. v. City of Aspen*, 192 Colo. 209, 557 P.2d 825 (1976)). This formulation requires some clarification.

In *Bar 70*, we held that no matter the sequence, the relevant act(s) "must be of such character as to perform three functions...." 703 P.2d at 1307 (citing *City of Aspen*, 696 P.2d at 762–63). The three required functions are: "(1) to manifest the necessary intent to appropriate water to beneficial use; (2) to demonstrate the taking of a substantial step toward the application of water to beneficial use; and (3) to constitute notice to interested parties of the nature and extent of the proposed demand upon the water supply." *Bar 70*, 703 P.2d at 1307. A relevant act need not perform all three functions, as long as all three functions are performed by some rel-

evant act or acts. An act which performs one or more of these functions is thereby an overt act for purposes of the first step test. Obviously, if a relevant act is deemed to have performed the first function of manifesting the necessary intent, then the necessary intent has been formed.

Thus, if the sequence of elements in a particular case is such that a relevant act precedes the formation of the necessary intent, then that act cannot be deemed to have performed the first required function of manifesting the necessary intent. The act, therefore, which is deemed to have manifested the necessary intent is the one act which cannot precede the formation of the necessary intent. However, an act preceding both the formation of the necessary intent and the act manifesting that intent may be relevant because that act may be deemed to have performed the second and/or the third required functions. In *City and County of Denver*, we held that "formation of the necessary intent to appropriate may succeed the performance of those overt acts that serve the purposes of demonstrating that a substantial step has been taken toward application of water to beneficial use and of putting others on notice of the prospective demand upon the water supply." 696 P.2d at 748. Conversely, overt acts performing those functions may precede the formation of intent.[5] Even so, the first step can never be completed before the formation of the necessary intent, and the appropriation date of a conditional water right cannot be set earlier than the formation of the requisite intent and the act which manifests that intent.

Turning to evidentiary concerns, the problem may arise as to what relevant act can be deemed to have performed the function of manifesting the necessary intent.

---

4. The reference to physical acts, plural, when explaining the action required to satisfy the first step test does not mean that a single act may not suffice if it satisfies the purposes of the requirement for overt acts. *See City of Aspen*, 696 P.2d at 763 n. 5.

5. Acts preceding the formation of the necessary intent and the act manifesting that intent were

relevant in *Harvey Land & Cattle*, 631 P.2d at 1113 (six water wells were in existence before filing an application which manifested the necessary intent), and in *Twin Lakes*, 557 P.2d at 828 (ditches of certain capacity constructed prior to formation of the intent to appropriate the additional water allowed by the large capacity of those ditches).

In *Harvey Land & Cattle*, 631 P.2d at 1113, and in *Twin Lakes*, 557 P.2d at 828, we held that the filing of an application for a conditional water right itself may be evidence that the necessary intent to appropriate water has been formed. That filing an application for a conditional water right may constitute such evidence means that the filing also was the relevant act which performed the first required function of manifesting the necessary intent. *See City and County of Denver*, 696 P.2d at 748 n. 14.

■ Given that filing an application for a conditional water right may be deemed to have performed the first function, we proceed to consider whether a filing may be deemed to have performed the second and third required functions if other relevant preceding acts are lacking or fail to qualify as overt under the first step test. While filing an application for a conditional water right certainly may be deemed to have performed the third required function of providing notice, *see Collard*, at 552, it is doubtful that a filing can be deemed in and of itself to have performed the second required function (*i.e.*, taking a substantial step to put the water to beneficial use). Other overt acts normally would be required. Under section 37–92–305(9)(b), 15 C.R.S. (1990), an applicant for a conditional water right must establish that water can be and will be "diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used." Establishing that waters can be diverted or controlled would entail some showing that certain measures toward the application of waters to beneficial use either have been taken before the application was filed or at least before trial. *See Southeastern Colorado Water Conservancy Dist. v. City of Florence*, 688 P.2d 715, 718 (Colo.1984)

(§ 37–92–305(9)(b) "requires proof that water will be diverted and that the project will be completed with diligence *before* issuance of a decree for a conditional right"). The relevant measures taken and offered as evidence to make the required proof under section 37–92–305(9)(b) also may be relevant for purposes of showing that the second function under the first step test thereby has been performed.

■ The relevant measures need not be physical acts in the conventional sense of the term. Because the statute is cast in terms of potentiality, that is, requiring proof that waters can and will be beneficially diverted, possessed or controlled, the relevant measures taken can be either physical acts, as conventionally understood, and/or formal acts. Formal acts include planning which is focused on the appropriation of water, studies undertaken as to whether a water diversion is feasible, specific expenditures of human and financial capital in this planning process, applying for various water permits, and other related legal or quasi-legal filings apart from the conditional water rights application itself.

We acknowledge that such formal acts hardly seem to qualify as "open and notorious physical demonstration[s]" of an intent to appropriate water to beneficial use. *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. 160, 165, 162 P. 161, 163 (1916). The traditional requirement that the overt act(s) be a physical demonstration, however, may no longer fully exhaust the more modern functional approach in which the critical inquiry is whether the relevant act or acts were sufficient to have performed one or more of the three required functions of the first step. *See City of Aspen*, 696 P.2d at 764.[6] Even in *Fruitland*, we rec-

---

**6.** In *City of Aspen*, one of the parties argued that the second prong of the first step test simply requires giving "notice of the intent to apply water to beneficial use." The opposing party argued that the second prong contemplates an " 'open physical act on the land sufficient to constitute notice to third parties of the intent to apply water to beneficial use.' " 696 P.2d at 761 n. 4. We held only that the overt acts necessary to satisfy the second prong need not take place "on the land." *Id.*, at 764. Due to the inade-

quate arguments and an insufficient record, we left unanswered whether such formal acts as permit applications filed with a regulatory body, correspondence between the applicant and another regulatory body, and especially public meetings held by a board of county commissioners and by a city council, performed one or more of the three required functions under the overt act(s) prong of the first step test. *Id.*, at 765.

ognized that the first step's primary function is to provide notice to interested parties. 62 Colo. at 165, 162 P. at 163.

■■■■ In applying this function-based test, we hold that formal acts may qualify as overt acts under the first step test so long as such formal acts perform one or more of the required functions. When a municipality or other public entity is the would-be appropriator, *see* § 37–92–103(8), 15 C.R.S. (1990), relevant formal acts also may include resolutions passed or other official decisions made, again so long as such formal acts are deemed to have performed one or more of the required functions. *Cf. Public Service Co. of Colorado v. Blue River Irrigation Co.*, 829 P.2d 1276, 1278–1279 (Colo.1992) (the following formal acts were evidence of due diligence: meetings with government regulatory bodies, permit applications from regulatory bodies, design and engineering studies, and financial expenditures for related administrative and legal fees).

To summarize, the division of the first step into an intent prong and an overt act(s) prong and the required concurrence of the two means that the first step may begin with either the formation of intent or an act which performs one or more of the three required functions. The first step cannot be said to have been taken or completed, however, until the intent has been formed and all three functions have been performed by one or more overt acts, either physical or formal. Thus, the formation of intent and the required overt act or acts may constitute a series of discrete events over time. However, the appropriation date cannot be set before the latest date in that series, which is the date on which it can be said that the first step has been taken to appropriate water.

■■■■ To conclude the framework for our analysis, we note that whether the relevant act or acts were sufficiently overt is a "mixed question of law and fact, the reso-

lution of which must be made by the court through the application of a legal standard to the particular facts of the case." *Bar 70*, 703 P.2d at 1306. That legal standard is of course the performance of one or more of the functions set forth above, recognizing that formal acts may qualify. However, even with the foregoing framework, the "determination whether the requisite first step has been taken [still] must be made on an *ad hoc* basis, taking into account the particular facts in each case." *City of Aspen*, 696 P.2d at 761. Finally, as always, the applicant has the burden of proving that a relevant act(s) has performed all of the required three functions and that the first step thereby has been completed on a particular date. *Bar 70*, 703 P.2d at 1306.

### 2. Applying the First Step Test.

With the foregoing analysis in mind, we turn to Thornton's argument that the appropriation date cannot be February 18, 1986, the date decreed by the water court and the date on which Fort Collins adopted the Plan. Thornton argues that filing the amendments on June 1, 1988 "was the first time that Fort Collins demonstrated any kind of intent to divert and appropriate a water right at the Nature Center Diversion Dam by overt acts sufficient to put interested persons on notice of its intended appropriation." Opening Brief for the Appellant at 22 n. 15. Thornton's argument here is predicated on the view that the 1986 application manifested an intent to appropriate a minimum stream flow while the 1988 amendments manifested an intent to divert water at the Nature Dam.

■■■■ We have already held that Thornton was on notice of the intent by Fort Collins to appropriate 55 cfs of Poudre River water from some point or points within the Corridor at least as of December 31, 1986, the date on which the original application was filed.[7] The first and third

---

7. That the 1988 amendments relate back to the 1986 application does not mean that an appropriation date will automatically fall on or before the date of the original application. Relation back of amendments to original pleadings

means only that the third parties were in fact on adequate notice as of the date of the original pleading. That Thornton was on notice that Fort Collins intended to appropriate Poudre River water as of December 31, 1986, does not

required functions were thus performed at least as of December 31, 1986. The issues now are whether the first and third functions were performed by a relevant act earlier than December 31, 1986, and when exactly was the second required function performed by a relevant act. The earliest date on which it can be said that the three functions were performed by relevant acts determines the appropriation date.

To properly apply the first step test to these issues we begin with the appropriation date awarded by the water court and inquire whether the relevant act which was the basis of the appropriation date could have been deemed to have performed all three required functions. The relevant act was the formal adoption of the Plan by the Fort Collins city council on February 18, 1986. If adoption of the Plan performed none of the required functions, then it cannot be the basis for the appropriation date. The inquiry then would proceed to other relevant acts, possibly done before but most likely after February 18, 1986, to determine the earliest date on which it can be said that all three functions of the overt act(s) prong of the first step have been performed.

■ Reviewing the evidence, we find that nothing in the Plan as adopted by Fort Collins could have placed Thornton or anyone else on notice that Fort Collins intended to *appropriate* water from the Poudre River pursuant to the Act. *See* § 37–92–103(3)(a), 15 C.R.S. (1990). Nothing in the Plan indicates that a legal appropriation of water is required to implement the Plan. If anything, the testimonial evidence shows that an appropriation of water was not contemplated. If an appropriation of water were a condition precedent to the success of the Plan, then it surely would have received a modicum of specific discussion. Although the Plan does contemplate the enhancement of the natural environment, many land use plans implicate environmen-

tal issues, including water management and water habitat issues, without thereby constituting an intent to appropriate water under the Act. Conceding the otherwise laudable intent of the Plan, for purposes of the first step test it must fail as an act sufficiently overt as to have put interested parties on notice that a legal appropriation of Poudre River water was intended.[8] Thus, adoption of the Plan cannot be deemed to have performed either the first or the third required functions under the first step test. For the same reasons, the formal adoption of the Plan cannot be said to have performed the second required function of demonstrating that a substantial measure has been taken to apply water to beneficial use. Thus, we hold that Fort Collins did not take the first step toward appropriating the Poudre River water on February 18, 1986, the date on which the Plan was adopted.

■ The water court cited a field trip by Fort Collins staff members at which photographs of what eventually would be the site of the Nature Dam were taken as confirming evidence of the formation of Fort Collins's intent to appropriate water as of February 18, 1986. That field trip did occur in February of 1986, but no more specific date is found in the record. Even if we were to assign the 18th as the date of the February 1986 field trip, such an act could not be deemed to have manifested an intent to appropriate water or to have performed any other required function. *See Bar 70*, 703 P.2d at 1307–08 (a field trip in the nature of a preliminary reconnaissance neither manifested an intent to appropriate water, nor demonstrated that a substantial measure was taken to apply waters to beneficial use, nor provided notice to interested parties).

The other relevant acts which the water court found to support an appropriation date of February 18, 1986, occurred after

mean that Fort Collins met all the requirements of the first step test on or before that date. *See* Part II A, *supra*.

**8.** Fort Collins argues that adoption of the Plan should be taken in the context of years of envi-

ronmental and land use planning. We decline to take this contextual approach because it is contrary to the first step test and the requirement that specific acts perform specific functions.

February 18, 1986, and as such cannot be deemed to establish the appropriation date of February 18, 1986. These post-February 18, 1986, acts were the posting of signs along the Corridor on December 31, 1986, and the publication in a local newspaper, also on December 31, 1986, of a notice to appropriate water. The dates of both acts coincide with the date of the filing of the original application for conditional water rights, an act which we have said performed the functions of manifesting intent and of providing notice to interested parties. It thus appears unlikely that the appropriation date can be set earlier than December 31, 1986. However, we remand this issue for a conclusive determination of the date on which the performance of all three required functions by a relevant act or acts concurred. We note that the record indicates that the decision to file the original application was made "sometime in November of 1986," and that the basis for the decision may have been "some preliminary work in the river on some structures." Although we have held that formal acts may satisfy the second required function, work on the river may be evidence of course of a substantial step taken to apply waters to beneficial use for purposes of the second required function under the first step test.[9]

### C

Thornton's final argument on appeal is that the Nature Dam is not a diversion within the meaning of the law. Thornton argues that because Fort Collins's claimed diversion at the Nature Dam is nothing more than a minimum stream flow right, the conditional decree cannot issue. Thornton again points to the "in-stream" language employed in the 1986 application and to the fact that this language precipitated objections, negotiations and finally settlement with the CWCB. The settlement resulted in the 1988 amendments. Thornton argues that even with the corrective amendments and even if those amendments were found to relate back Fort Collins was still seeking and therefore was in fact granted an illegal conditional decree for a minimum stream flow rather than for a legal diversion at the Nature Dam.

The water court held that the Nature Dam diverts Poudre River water from a more recent channel back into its historic channel. "[B]ut for the dam," in the water court's view, "the river would run in a different course." Thus, at the Nature Dam water from the Poudre River "is captured, it is controlled, and it is possessed" by Fort Collins, according to the water court. The water court concluded that the Nature Dam is a "diversion" and that the uses of the diverted water were beneficial.

■■■ We first review the relevant statutes. Under section 37–92–103(3)(a), 15 C.R.S. (1990), an " '[a]ppropriation' means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law...." Section 37–92–305(9)(b), 15 C.R.S. (1990), sets forth in part the criteria for awarding a conditional water appropriation:

> [n]o claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

Water can be appropriated either by diverting water or by otherwise controlling water. An application for a conditional water right may be adjudicated if either diversion of water or control of water is established, assuming that the resultant use is beneficial. A diversion in the conventional sense is not required. Under section 37–92–103(7), 15 C.R.S. (1990):

> "Diversion" or "divert" means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, con-

---

**9.** This issue is important because if that preliminary work cannot be deemed to have performed the second required function, then the appropri- ation date may fall *after* December 31, 1986, depending on when a substantial measure was taken to apply waters to beneficial use.

duit, well, pump, or other structure or device.

Thus, to effect a diversion under the statute, water either must be removed or it must be controlled. Because "the disjunctive 'or' demarcates different categories," *Bloomer v. Boulder County Bd. of Comm'rs*, 799 P.2d 942, 946 (Colo.1990), removing water cannot be the same as controlling water. Removal is taking the water *from* its natural course or location, while control is exercised over the water *in* its natural course or location. Clearly, a diversion in the conventional sense of the term, meaning removing water and carrying it away from its natural course or location, is no longer required. *See Colorado River Water Conservation Dist. v. Colorado Water Conservation Board,* 197 Colo. 469, 474, 475, 594 P.2d 570, 573, 574 (1979). We have held that " 'there may be a constitutional appropriation of water without its being at the instant taken from the bed of the stream.' " *Id.* at 474, 594 P.2d at 573 (citing *Larimer Co. v. Luthe,* 8 Colo. 614, 9 P. 794 (1886) (emphasis deleted)). Controlling water within its natural course or location by some structure or device for a beneficial use thus may result in a valid appropriation.

A dam certainly qualifies as a structure or device. A dam therefore is comprehended by the provision that the requisite removal or control may be effected by some "structure or device" other than the ones listed, so long as the removal or control of the water is for a beneficial use.

A beneficial use is defined in section 37–92–103(4), 15 C.R.S. (1990), as:

the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery or wildlife. For the benefit and enjoyment of present and future generations, "beneficial use" shall also include the appropriation by the state of Colorado in the manner prescribed by law of

such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree.

This statute provides that water appropriated for municipal, recreational, piscatorial, fishery, and wildlife purposes is water put to beneficial uses.

As to the appropriation of a minimum stream flow, in 1987 the General Assembly amended section 37–92–102(3) and vested the CWCB with "exclusive" authority to appropriate "minimum stream flows" and "natural surface water levels or volumes for natural lakes." *See* 1987 Colo.Sess. Laws, ch. 269 at 1305–06. Section 37–92–102(3) in relevant part now reads:

Further recognizing the need to correlate the activities of mankind with some reasonable preservation of the natural environment, the Colorado water conservation board is hereby vested with the exclusive authority, on behalf of the people of the state of Colorado, to appropriate in a manner consistent with sections 5 and 6 of Article XVI of the state constitution, such waters of natural streams and lakes as the board determines may be required for minimum stream flows or for natural surface water levels or volumes for natural lakes to preserve the natural environment to a reasonable degree. In the adjudication of water rights pursuant to this article and other applicable law, no other person or entity shall be granted a decree adjudicating a right to water or interests in water for instream flows in a stream channel between specific points, or for natural surface water levels or volumes for natural lakes, for any purpose whatsoever.

The exclusive authority vested in the CWCB to appropriate minimum stream flows does not detract from the right to divert and to put to beneficial use unappropriated waters by removal or control. *See Colo. Const.,* Art. XVI, § 6.

■ Thus, according to the plain language of the foregoing statutes, we hold that water may be appropriated by a structure or device which either removes water

away from its natural course or location and towards another course or location or which controls water within its natural watercourse, assuming such action puts the water to beneficial use. The type of beneficial use to which the controlled water is put may mean that the water must remain in its natural course. This is not an appropriation of a minimum stream flow, an appropriation given exclusively to the CWCB. A minimum stream flow does not require removal or control of water by some structure or device. A minimum stream flow between two points on a stream or river usually signifies the complete absence of a structure or device. Furthermore, that an appropriation of a minimum stream flow by the CWCB must put that stream flow to the beneficial use of the preservation of nature does not mean that the beneficial uses to which waters controlled by some structure or device may not also redound to the preservation of piscatorial and other natural resources. Although controlling water within its natural course or location by some structure or device may effect a result which is similar to a minimum flow, that does not mean that the appropriation effected by the structure is invalid under the Act. When the application of water to beneficial use is effected by some structure or device, the resulting appropriation is by a diversion within the meaning of the Act.

The issue then is whether the appropriation of water effected by the Nature Dam is a removal or control of water for beneficial use within the meaning of the foregoing statutes. The water court found that the Nature Dam removes Poudre River water from its natural course or location and puts that water to a beneficial use. We agree. As on the issue of relation back of the 1988 amendments to the 1986 application, Thornton again argues that Fort Collins's persistent intent to appropriate minimum stream flows means that the appropriation at the Nature Dam is an invalid appropriation. To be sure, re-labeling what is otherwise a minimum stream flow without control by some structure or device as a diversion, that is, removal or control of water by some structure or device, does not transform the former into the latter from a legal point of view. However, it is clear that the Nature Dam is a structure which either removes water from its natural course or location or controls water within its natural course or location given that the Poudre's "historic" channel may be considered the River's natural course or location. The uses of the Poudre River water so controlled are recreational, piscatorial and wildlife uses, all valid under the Act.

The water court also found that Fort Collins does not claim a right to exercise dominion and control of the water after it leaves the point of the Nature Dam. Thornton argues that this means that Fort Collins has not appropriated the waters for the claimed beneficial uses because the water may be appropriated by others after leaving the Nature Dam thereby preventing its beneficial use by Fort Collins. It appears that the water court included in its decree a finding of no claim to control the water because of the negotiated settlement and stipulations made between Fort Collins and the CWCB. However, a "stipulation cannot be used to bind a court in the determination of questions of law or mixed questions of law and fact." *Bar 70*, at 1306 (note omitted). Whatever the reason that the CWCB insisted that Fort Collins so disclaim control of the water after it passed the Nature Dam, we hold that no such disclaimer is required in order to find that the appropriation is a valid diversion and/or to insure that the appropriation is not a minimum stream flow exclusively reserved to the CWCB. Under the statutes, to control water within its natural course or location means that the appropriator exercises control over the water at least to the extent that the water continues to be put to beneficial use by the appropriator, in this instance by Fort Collins. Thus, Fort Collins may validly exercise dominion over the Poudre River water once it passes the Nature Dam and continues within that segment of the river in which such water is put to beneficial use. If and when the water passes downstream from that controlled segment of the Poudre it may be

subject to further appropriation by others. That CSU owns and operates the land along which the beneficial uses are to take place does not in and of itself mean that the beneficial uses can not or will not take place. *See FWS Land and Cattle Co. v. State of Colo. Div. of Wildlife*, 795 P.2d 837, 840 (Colo.1990). Because we have held that control of water within its natural course or location by a structure may be a valid appropriation under the Act, upon remand the water court must conclusively determine whether the agreements between Fort Collins and CSU are such as to show that the claimed waters can and will be put to the beneficial uses stated in the application.

### III

On cross-appeal Fort Collins argues that the water court erred in declining to award a conditional water right for the Power Dam. The water court found that there was insufficient "evidence to show that the flow of the river at the Power Dam is controlled." Specifically, the water court held that the boat chute and the fish ladder at the Power Dam do "not add any control to the river; water is directed through the boat chute and the fish ladder only at an unspecified low flow of the river." The water court concluded that "the river continues to flow as it did prior to any construction" at the Power Dam and that therefore the effect of the Power Dam is not a "diversion" under section 37–92–103(7), 15 C.R.S. (1990). As it is not a legal diversion, the appropriation there would constitute an invalid minimum stream flow appropriation, according to the water court.

▆▆▆ The boat chute and the fish ladder were included in the reconstruction and renovation of the Power Dam in 1987. In general, boat chutes and fish ladders, when properly designed and constructed, are structures which concentrate the flow of water to serve their intended purposes. A chute or ladder therefore may qualify as a "structure or device" which controls water in its natural course or location under section 37–92–103(7).

The water court's reasoning that the boat chute and the fish ladder at the renovated Power Dam do not add any control to the river or that the river continues to flow as it did prior to the renovation of the Power Dam suggests that the chute and the ladder in fact fail to function as designed. That is, the chute does not allow kayaks or other flotation devices to pass through the Power Dam and the ladder does not assist fish to scale the Power Dam. If this is the case, then the waters claimed at the Power Dam are not being put to beneficial use, and the claimed appropriation may be denied for this reason.

However, there was no evidence presented at trial that the chute and the ladder have failed to function as designed. Rather, there was some testimonial evidence that the chute and the ladder do function properly under low flow conditions. The record indicates that disputes remain as to whether boats (or kayaks and inner tubes) are allowed to take advantage of the chute, but that fish are using or will use the ladder was not disputed. That the chute and the ladder function as designed means that the water can be controlled such as to be put to recreational and wildlife uses, both beneficial uses under the Act. That the chute and the ladder control and direct river water *only* at unspecified low flows in the river is not a defect since that is precisely what they are designed to do. We therefore reverse the water court's conclusion that the Power Dam does not effect a diversion within the meaning of the Act.

The water court's conclusion that the Power Dam was not a legal diversion precluded the disposition of other issues which would have been addressed had the water court found the Power Dam to be a structure which controlled water within the meaning of the Act. Thus, we remand the claim for Poudre River water at the Power Dam for a conclusive determination as to whether the boat chute and the fish ladder can and will put water to beneficial use. In addition, the water court must make a separate determination of the appropriation date for the Power Dam under the first step test described in Part II B. The act(s) relevant to the determination of the appro-

priation date for the Nature Dam may or may not be relevant to the determination of the appropriation date for the Power Dam.[10]

## IV

Thornton was on notice of the intent by Fort Collins to appropriate a certain amount of water from a sufficiently precise location of the Poudre River by the application for conditional water rights filed by Fort Collins in 1986. The 1988 amendments therefore relate back. However, because passage of the Plan by the Fort Collins city council does not perform the functions of the first step, we reverse setting the appropriation date of February 18, 1986, for the water rights at the Nature Dam, and remand for an application of the first step test according to the principles framed in this opinion. Whatever the appropriation date, we find that the Nature Dam may effect a valid appropriation. Finally, we hold that the Power Dam qualifies as a structure which controls water and thus also may effect a valid appropriation. The appropriation date of the Power Dam diversion and related issues must be determined by the water court according to the views set forth in this opinion.

ERICKSON, J., does not participate.

**10.** The question may arise as to whether an appropriation of 55 cfs of Poudre River water at the Power Dam is required at all. The Power Dam is upstream from the Nature Dam. The record indicates that water called to the Nature Dam necessarily will pass through the Power Dam. Presumably, any water called to the Power Dam will eventually pass the Nature Dam. Thus, the priority date of the downstream structure, here the Nature Dam, effectively guarantees the water use at the upstream structure, here the Power Dam. However, at some point in time the water use at the Nature Dam may be abandoned while the use at the Power Dam may not. Thus, Fort Collins may validly appropriate the same water by separate structures so long as each structure controls and puts water to beneficial use.