76 P.3d 906 (2003)
In the Matter of the Application for Water Rights of Peter VOUGHT and the Stucker Mesa Domestic Pipeline Company in Delta Colorado.
Peter Vought, Applicant-Opposer-Appellant,
v.
Stucker Mesa Domestic Pipeline Company, Applicant-Opposer-Appellee, and
Division Engineer, Water Division 4, Appellee pursuant to C.A.R. 1(e).
No. 02SA293.
Supreme Court of Colorado, En Banc.
June 16, 2003.
*908 Patrick, Miller & Kropf, P.C., Kevin L. Patrick, Sara M. Dunn, Aspen, Colorado, Attorneys for Applicant-Opposer-Appellant.
Briscoe & Stanway, P.C., S. Gregg Stanway, Hotchkiss, Colorado, Attorneys for Applicant-Opposer-Appellee.
Division Engineer, Water Division 4, Filed Notice of Non-participation.
Justice HOBBS delivered the Opinion of the Court.
This case involves a dispute over appropriation dates for the right to use water from springs located on Peter Vought's land.[1] *909 Vought appeals a decision by the District Court for Water Division No. 4, granting conditional water rights to both Vought and Stucker Mesa Domestic Pipeline Company (Stucker Mesa) from the same water supply sourcesprings[2] arising on Vought's propertywith an earlier appropriation date for Stucker Mesa's domestic use over Vought's domestic use.
We affirm the water court's holding that Vought's conditional water rights for domestic use have an appropriation date of October 23, 2000. We agree with the water court that Stucker Mesa has an earlier appropriation date for domestic use, but it is October 6, 2000, not September 27, 2000; hence, we reverse the water court's ruling in part. We also affirm (1) the water court's ruling that Stucker Mesa satisfied the can and will test, and (2) the water court's refusal to dismiss Stucker Mesa's water rights applications.

I.
The water sources claimed for appropriation by both parties in this case are springs located on Vought's land near Paonia in Delta County. The springs are tributary to the North Fork of the Gunnison River. Small amounts of water for domestic use are involved. The principal issue is who has the earlier appropriation date. Stucker Mesa seeks a decree for conditional water rights in the amount of 0.01 cubic feet per second (c.f.s.) from Spring No. 1 and Spring No. 2.[3] Vought seeks a decree for conditional water rights in the amount of 0.01 c.f.s. from each of the Springs Nos. 1, 2, and 3.
Vought's application claims that he used the spring water for his livestock since 1970, and he intended since 1970 to build a house on the land and use spring water for a domestic supply. There is no dispute about Vought's absolute water right for the livestock use. The issue is who has the earlier appropriation date for domestic use.
Stucker Mesa is a non-profit domestic water supply company serving twenty-one taps in the area. The company's current water supply is from two other springs not involved in these applications. Stucker Mesa does not have enough water to fully meet the demand of its customers.[4] Steve Wolcott, President of Stucker Mesa, and Vought are both tap owners and shareholders in Stucker Mesa.
In 1994, a fire swept through the area, burning the hillside where the springs are located and revealing green areas not previously visible from a distance. Stucker Mesa owns an easement over Vought's property for a pipeline, which runs down the hillside several hundred feet from the nearest spring. Sighting the green areas and investigating for a possible pipeline leak and a possible additional water source that would benefit the Stucker Mesa shareholders, including Vought, employees of Stucker Mesa crossed onto Vought's property to the springs, which were in plain view from and relatively close to the easement.
Vought is an absentee landowner. He has used Spring No. 1 for livestock watering since 1970. His ranch foreman from 1995 to December 2001 was Robert Arterburn. Stucker Mesa supplies domestic water to two *910 buildings on the property. Vought testified that he intended since 1970 to build a house on the property and use water from the springs for a domestic supply to it.
Arterburn testified to four actions he took on the property in support of Vought's conditional water rights for domestic use. On October 22, 1996, he cleared debris off of a road leading toward Spring No. 1. On January 27, 1999, he phoned Merritt Dennison, an employee at the Colorado Division of Water Resources, to discuss a possible water rights application. Sometime in October 1999, he drove wooden stakes into each of the three springs with the date "1999 Oct" written on them. In the fall of 2000, following Stucker Mesa's applications for conditional water rights, he dug holes around Spring No. 1 to improve flow and installed pipes leading to a barrel, so he could measure and increase water flow for livestock and domestic use.
Stucker Mesa presented testimony from several individuals regarding steps it took and contradicting Arterburn's testimony. Both parties agree that Stucker Mesa employees entered Vought's property on two occasions prior to filing for the Stucker Mesa conditional decree, and once afterwards. On these occasions, they crossed from Stucker Mesa's easement on Vought's property and walked to the springs, causing no property damage.
During the first entry, on September 26, 2000, Steve Wolcott, Stucker Mesa's President, Phillip Johnson, Stucker Mesa's Vice President, and William Pitt, a private excavating contractor working for Stucker Mesa, walked along Stucker Mesa's easement, inside of Vought's property, marking the location of Stucker Mesa's pipeline. Seeing the green spots on Vought's property, Wolcott thought the pipeline might be leaking. Upon determining that the pipeline was probably not leaking, Wolcott, Johnson, and Pitt departed from the easement to investigate an apparent water source that might benefit Stucker Mesa's shareholders, including Vought. Wolcott testified that Spring No. 1, the largest of the three springs, had a little trickle of water running down the hillside from it; the only standing water was contained in elk footprints. The three men testified that they saw no sign of development of the springsno stakes, holes, or barrels.
The next day, September 27, 2000, Wolcott again entered onto the Stucker Mesa easement on Vought's property and departed the easement to inspect the springs, this time with his son, Eli Wolcott, who is a geographic information systems (GIS) consultant. Eli used a global positioning system (GPS) device to fix the location of the springs. Wolcott testified that he tasted the water for potability.
After Wolcott filed for conditional water rights, he returned a third time to take pictures and water samples of the springs, on this occasion with his wife, Linda Lindsay. The pictures were later lost. Lindsay testified that she saw no sign of development, and that "[i]t didn't look like anybody had been there for ages." After Lindsay and Wolcott had been at the spring a few minutes, Arterburn joined them and began a lengthy discussion about Stucker Mesa's water rights applications. On the previous trips, Wolcott and his companions had not encountered either Vought or Arterburn.
Although Wolcott filed the Stucker Mesa applications in his own name on October 6, 2000, he later filed an amendment substituting Stucker Mesa as the applicant, because he had been acting on the water company's behalf. The Stucker Mesa applications sought conditional rights for 0.01 c.f.s. from Spring No. 1, in case number 00CW157, and 0.01 c.f.s. from Spring No. 2, in case number 00CW158claiming a September 27, 2000 appropriation date for each spring, the date of the second entry onto the Stucker Mesa easement and Vought's property to establish the location of the springs through the GPS device. On November 28, 2000, Vought filed statements of opposition to both applications, asserting his livestock use of the springs since 1970 and claiming that Stucker Mesa employees had trespassed on his land before filing the Stucker Mesa applications.
On October 23, 2000, Vought filed his own application, in case 00CW168, claiming (1) an absolute water right from Spring No. 1 for stock water with an appropriation date of May 1, 1970, and (2) conditional water rights from Spring No. 1 for domestic and irrigation uses with an appropriation date of May 1, 1970 and Springs Nos. 2 and 3 for stock, *911 domestic, and irrigation uses, for a total of 0.05 c.f.s. of water. Originally, Vought claimed an appropriation date of October 18, 2000 for the conditional water rights in Springs Nos. 2 and 3, but he later amended his application to claim an appropriation date of October 22, 1996the date on which Arterburn improved the road leading to Spring No. 1.
The Division 4 Water Referee inspected the springs and concluded that water was available for the Vought and Stucker Mesa applications. The referee recognized Vought's absolute water rights for 0.01 c.f.s. from each of Springs Nos. 1, 2, and 3 for stock water with an appropriation date of May 1, 1970. The referee recognized Vought's conditional rights for 0.01 c.f.s. from each of Springs Nos. 1, 2, and 3, with an appropriation date of October 23, 2000 for domestic use.
The referee recognized Stucker Mesa's conditional water rights for 0.01 c.f.s. of water for domestic use from each of Springs Nos. 1 and 2, with an appropriation date of September 27, 2000.
Vought protested the referee's ruling, asserting that Stucker Mesa's applications were void, or voidable, because of trespass and Stucker Mesa did not prove that it can and will place the water to beneficial use. The water court denied Vought's motion for summary judgment to dismiss Stucker Mesa's water rights applications based on trespass. The water court conducted a one-day trial and entered an order and decree resolving all three cases. The court recognized Vought's absolute right for a total of 0.03 c.f.s. of stock water, 0.01 c.f.s. from each spring; Stucker Mesa does not appeal the absolute decree for the stock water rights. The water judge decreed to Vought conditional water rights for 0.01 c.f.s. from each of Springs Nos. 1, 2 and 3 for a total of 0.03 c.f.s. for domestic use, with an appropriation date of October 23, 2000.
The water judge decreed to Stucker Mesa conditional domestic water rights for 0.01 c.f.s. from each of Springs Nos. 1 and 2, with an appropriation date of September 27, 2000.
Vought claims on appeal that the water court incorrectly applied the first step test to determine the appropriation dates for his and for Stucker Mesa's conditional water rights.[5] He contends that his date of appropriation for the conditional water rights should have been no later than October 1999 and Stucker Mesa's appropriation date could be no earlier than October 6, 2000, the date of its applications. Vought argues that the Stucker Mesa applications are void, or voidable, for trespass and Stucker Mesa did not prove it can and will appropriate the water with diligence and within a reasonable time, because Stucker Mesa does not currently have legal access to the springs.

II.
We affirm the water court's holding that Vought's conditional water rights for domestic use have an appropriation date of October 23, 2000. We agree with the water court that Stucker Mesa has an earlier appropriation date for domestic use, but it is October 6, 2000, not September 27, 2000; hence, we reverse the water court's ruling in part. We also affirm (1) the water court's ruling that Stucker Mesa satisfied the can and will test, and (2) the water court's refusal to dismiss Stucker Mesa's water rights applications.

A.

Requirements for Obtaining a Conditional Water Right Decree
Based on the doctrine of prior appropriation, water courts set priority dates for Colorado water rights that have their source of supply in surface water or tributary groundwater. See Aspen Wilderness Workshop, Inc. v. Hines Highlands Ltd. P'ship, 929 P.2d 718, 724 (Colo.1996). A water right arises only by actually placing the water to beneficial use, but a conditional water right decree allows the appropriation to relate back to the time when the appropriator completed the "first step" towards an appropriation, if the conditional appropriation is diligently pursued to completion. Fruitland *912 Irrigation Co. v. Kruemling, 62 Colo. 160, 165, 162 P. 161, 163 (1916); § 37-92-305(9)(b), 10 C.R.S. (2002).
To decree a conditional water right, the water court must find and conclude that the applicant completed the first step for an appropriation and that the applicant can and will complete the appropriation diligently and within a reasonable time. § 37-92-305(9)(b), 10 C.R.S. (2002); City of Thornton v. City of Fort Collins, 830 P.2d 915, 924-25 (Colo.1992) (Thornton). A conditional water right is "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37-92-103(6), 10 C.R.S. (2002).
A conditional water right holds the place of the appropriator in priority, so long as the appropriation is diligently pursued and perfected by application of the water to beneficial use. Mount Emmons Mining Co. v. Crested Butte, 40 P.3d 1255, 1258 (Colo.2002). The priority date of the water right is a function of the appropriation date and the adjudication date. The adjudication date is the year in which the application is filed; the appropriation date is the date on which the appropriator completed the first step towards the appropriation. Dallas Creek Water Co. v. Huey, 933 P.2d 27, 35 (Colo.1997).

1.

First Step Test
The first step towards an appropriation is complete when overt acts coalesce to openly demonstrate the applicant's intent to appropriate the water for a beneficial use; whether the intent or the acts occurred first makes no difference. Thornton, 830 P.2d at 924-25; Elk-Rifle Water Co. v. Templeton, 173 Colo. 438, 446, 484 P.2d 1211, 1215 (1971). The water court's determination of the appropriation date is fact-specific. "[W]hat constitutes the `first step' is not the same in every proposed diversion because the facts must be taken into consideration in each case on an Ad hoc basis." Four Counties Water Users Assoc. v. Colo. River Water Conservation Dist., 161 Colo. 416, 422, 425 P.2d 259, 261 (1967); see City & County of Denver v. Colo. River Water Conservation Dist., 696 P.2d 730, 746 (Colo.1985) (Denver).
The first prong of the first step test requires the intent to appropriate water. Intent to appropriate requires "a fixed purpose to pursue diligently a certain course of action to take and beneficially use water from a particular source." Denver, 696 P.2d at 745. The intent must be relatively specific regarding the amount of water to be appropriated, its place of diversion, and its type of beneficial use; but, for the purposes of a conditional water right decree, the applicant need not know the exact amount of water or point of diversion at the time of the first step. Id. at 747 n. 13. The applicant may demonstrate intent by filing the conditional water right application. Thornton, 830 P.2d at 926; Twin Lakes Reservoir & Canal Co. v. City of Aspen, 192 Colo. 209, 214, 557 P.2d 825, 828 (1976).
The second prong of the first step test requires that the applicant perform an overt act or acts in furtherance of the intent to appropriate water and apply it to a beneficial use. Bar 70 Enters., Inc. v. Tosco Corp., 703 P.2d 1297, 1307 (Colo.1985). The overt act or acts must fulfill three functions: (1) manifest the necessary intent to appropriate water to beneficial use; (2) demonstrate the taking of a substantial step toward the application of water to beneficial use; and (3) constitute inquiry notice to interested persons of the nature and extent of the proposed demand upon the water supply. City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 32 (Colo.1996) (Bijou Irrigation); Bar 70, 703 P.2d at 1307. The overt acts can be physical acts or other useful acts towards effectuating an appropriation, such as planning the appropriation of water, undertaking studies regarding feasibility of the diversion, expending human or financial capital in activities connected with the appropriation, or applying for required permits. Thornton, 830 P.2d at 926.
The first function of the second prong of the first step test, manifesting intent to appropriate water for a beneficial use, is similar to the first prong (intent). When the applicant proves an overt act demonstrating intent, he or she also proves the first prong of the first step test. See id. at 925. Filing an application for a conditional water *913 right can satisfy the intent prong of the first step test and fulfill the first function of the second prong, manifesting the intent to appropriate water. Id. at 926.
The second function of the second prong of the first step test, taking a substantial step towards applying the water to a beneficial use, turns on the facts of the case. There is no bright line rule for when an act constitutes a sufficient "substantial step." In Thornton, we explained that it is unlikely that the act of filing an application for a conditional water right, without any other actions, will fulfill the second function of the second prong of the first step test. Id. A detailed field survey can constitute a substantial step in some circumstances. Bar 70, 703 P.2d at 1308. However, whether a field survey performs this function is fact-specific. In Bar 70, we held that a field trip by applicants fell short of constituting a substantial step toward appropriation, when the applicants failed to approach the proposed pumping site, failed to survey the points of diversion and storage, and failed to locate monuments or set stakes. Id.
The third function of the second prong of the first step test, giving notice to interested persons of the nature and extent of the proposed demand upon the water supply, is perhaps the most important function. It must place other potential or actual appropriators on inquiry notice regarding the source of the water supply, point of diversion, beneficial use, and amount of diversion. Fruitland Irrigation, 62 Colo. at 165, 162 P. at 163; see City and County of Denver v. N. Colo. Water Conservancy Dist., 130 Colo. 375, 393, 276 P.2d 992, 1001 (1954).
Inquiry notice requires more than mere notice of an unrefined intent to appropriate, but less than a detailed summary of exact diversion specifications. Bijou Irrigation, 926 P.2d at 34. Filing an application for a conditional water right can provide sufficient notice of the intent to appropriate. Thornton, 830 P.2d at 926. A field survey of the proposed appropriation site, without visible staking or posting, does not provide the required notice.[6] Even a field survey, where signs are posted alerting readers of a pending water right application, provides insufficient notice where the signs do not indicate the potential uses or potential quantities of water proposed for diversion. Bijou Irrigation, 926 P.2d at 34-35.
Whether an applicant for a conditional water right has completed the first step towards an appropriation is a mixed question of law and fact, requiring application of a legal standard to the particular facts of the case. Bijou Irrigation, 926 P.2d at 32. We defer to the court's findings of fact if they are supported by the record and review the court's legal conclusions de novo. See People v. Schall, 59 P.3d 848, 851 (Colo.2002).
In addition to satisfying both prongs of the first step test, the applicant must demonstrate that he or she meets the can and will test.

2.

Can and Will Requirement
An applicant must prove by a preponderance of the evidence that he or she can and will complete the appropriation diligently and place the water to a beneficial use within a reasonable time. Aspen Wilderness Workshop, 929 P.2d at 723-24. The General Assembly enacted section 37-92-305(9)(b), 10 C.R.S. (2002), to reduce speculation associated with conditional water decrees and to increase certainty in the administration of *914 water rights. FWS Land & Cattle Co. v. Colorado, 795 P.2d 837, 840 (Colo.1990). The statute provides:
No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.
§ 37-92-305(9)(b), 10 C.R.S. (2002). The can and will statute requires the applicant to prove a substantial probability that the appropriation can and will be completed with diligence, based upon necessarily imperfect predictions of future conditions. Aspen Wilderness Workshop, 929 P.2d at 724. As a threshold, such a showing requires proof that unappropriated water is available for appropriation. Id. at 723. Commencing with the conditional decree proceeding, the water court considers a number of factors in making diligence determinations about the course of steady progress towards completion of the appropriation. Dallas Creek Water Co., 933 P.2d at 36.
Access to the property of another to construct necessary water project features can be an issue in the conditional decree proceeding. In Gibbs v. Wolf Land Co., we held that an appropriator can invoke the statutory right of private condemnation to satisfy the can and will requirement for obtaining a conditional decree, "unless the record clearly indicates that there are no circumstances under which the applicant may obtain access to the property necessary to finalize the conditionally decreed right." Gibbs v. Wolf Land Co., 856 P.2d 798, 803 (Colo.1993). In the cases where we found that the can and will requirement was not satisfied, the applicant could not utilize the private condemnation statute because the water source was located on public land, the required governmental authorization to access the property was denied, and the denial was final. See West Elk Ranch v. United States, 65 P.3d 479, 481-82 (Colo.2002); FWS Land & Cattle, 795 P.2d at 840.
The statutory right of condemnation for owners of conditional or absolute water rights implements the constitution. Colo. Const., art. XVI, § 7.
Any person owning a water right or conditional water right shall be entitled to a right-of-way through the lands which lie between the point of diversion and point of use or proposed use for the purpose of transporting water for beneficial use in accordance with said water right or conditional water right.
§ 37-86-102, 10 C.R.S. (2002); see Bd. of County Comm'rs v. Park County Sportsmen's Ranch LLP, 45 P.3d 693, 711 (Colo.2002). If the owner of the property through which the right-of-way would run refuses to allow the construction of the necessary water feature on his or her property, the water right owner may exercise the condemnation right with payment of just compensation. § 37-86-104, 10 C.R.S. (2002). The General Assembly clearly anticipated situations in which an applicant for a conditional water right would not own such a right-of-way at the time of application.

B.

Application of the First Step Test to this Case
In this appeal, Vought challenges the appropriation dates the water court decreed for his conditional water rights and for Stucker Mesa's conditional water rights. We begin by analyzing Vought's actions to determine if and when he completed the first step toward appropriating water from the springs.

1.

Vought's Application for Conditional Water Rights
The water court awarded Vought a decree for conditional water rights of 0.01 c.f.s. for each spring from Springs Nos. 1, 2, and 3 for domestic use, with an appropriation date of October 23, 2000. This is the date on which Vought filed his application for conditional water rights with the court. It is undisputed that Vought met the first prong of the first step test; he had the intent to appropriate water from the springs for domestic use since 1970. Nevertheless, the water court found that the date on which *915 Vought filed the application for conditional decree was the first time his overt acts towards an appropriation coalesced to fulfill the three required functions of the second prong of the first step test.
Arterburn, Vought's foreman, testified about several actions he took on Vought's behalf. On October 22, 1996, he cleared and widened a road leading toward Vought Spring No. 1. On January 27, 1999, he telephoned an employee of the Colorado Division of Water Resources and discussed the pros and cons of filing for water rights in the springs. In October of 1999, he drove a stake into each spring. After Stucker Mesa filed its applications in the fall of 2000, he dug holes around Spring No. 1 and installed pipes and a barrel in order to increase and measure the flow.
The water court found that Arterburn improved the road and telephoned the Division Engineer's office to discuss filing. The court noted that "the evidence is in conflict with respect to whether the stakes existed, at least as of the fall of [2000]." Nevertheless, the court concluded thatassuming the stakes existed at one timethey did not constitute an overt act demonstrating intent to appropriate. The water court found that Arterburn "dug some holes, cleared out an area around at least the large spring, [and] installed some pipes and a barrel for the purposes of collection of water in measurement of water flow in the fall of 2000" after Stucker Mesa filed its conditional water rights applications.
Vought's overt acts must satisfy the three functions of the second prong of the first step test by: (1) manifesting the necessary intent to appropriate water to beneficial use; (2) demonstrating the taking of a substantial step toward the application of water to beneficial use; and (3) constituting inquiry notice to interested persons of the source of supply, the point of diversion, the amount of diversion, and the type of use. Bijou Irrigation, 926 P.2d at 32. The water court determined that the three functions were fulfilled, but not until the date on which Vought filed his conditional water right application, October 23, 2000. We agree with the water court.
The first function of the second prong of the first step test requires an overt act manifesting the necessary intent to appropriate water for a beneficial use. It is undisputed that Vought intended to appropriate the water since 1970, and his overt acts were sufficient to demonstrate that intent. Clearing a road to improve access to the springs, discussing the intent to appropriate with state officials, staking the springs, and filing an application for water rights all manifested Vought's intent to appropriate.
The second function of the second prong of the first step test requires an overt act demonstrating the taking of a substantial step towards placing the water to a beneficial use; this is a fact-specific inquiry. The acts required for demonstration of a substantial step vary in relation to the magnitude of the proposed water development. A multi-million dollar project in which large amounts of water are proposed to be diverted and transported over long distances will require a greater demonstration of sufficient activity than a small project tapping a very limited water supply.
Vought testified that his development plan required only that he install a pump and pipe to place the water into a holding tank outside his home. In light of the limited scale of Vought's proposed appropriation, a substantial step would entail a small amount of activity and capital investment. Based on the record in this case, the water court found that Arterburn's action in digging around the spring and installing pipes and a barrel was the first substantial act taken on behalf of Vought towards placing the water to a beneficial use. We agree.
The water court concluded, and we agree, that clearing the road does not constitute a substantial act. Clearing the road was not tied to accessing Spring No. 1 for developing the water for domestic use. Nor is the discussion with the Division Engineer's Office about the possibility of filing an application a substantial step. Because filing an application for a conditional water right does not constitute a substantial step, Thornton, 830 P.2d at 926, it follows that discussing a possible application cannot satisfy the substantial step requirement. Nor is staking tied to any logical act of developing the spring for beneficial use.
*916 The third function of the second prong of the first step test requires an overt act constituting inquiry notice to other potential or actual appropriators of the nature and extent of the proposed demand upon the water supply. The notice must be reasonably specificmore than mere notice of an unrefined intent to appropriate but less than a detailed summary of exact diversion specifications. Bijou Irrigation, 926 P.2d at 34. Vought's improvement of the road did not provide sufficient notice. As the water court found, no would-be appropriator would have any notice that Vought intended to appropriate water based on his improvement of the road and would have no inkling of the nature and extent of his intended use thereby. Similarly, a private conversation with a state employee is insufficient to provide notice to interested persons of an appropriation. The water court found that the stakes Arterburn placed were obscured by cattails and likely were not visible. Moreover, adequate posting must be sufficiently detailed to describe the nature and extent of claimed water rights and must be "more than mere notice of an unrefined intent to appropriate." Bijou Irrigation, 926 P.2d at 34. The staking here fell short of providing notice to other appropriators. Vought took an act fulfilling the third function of the second prong, inquiry notice regarding the nature and extent of his appropriations, when he filed his water court application.
We affirm the water court's holding that Vought's actions coalesced to fulfill the three functions of the second prong of the first step test when he filed his application for conditional water rights on October 23, 2000. Not until then did he provide sufficient inquiry notice of his appropriation. See Thornton, 830 P.2d at 926.

2.

Stucker Mesa's Applications for Conditional Water Rights
The water court ruled that Stucker Mesa completed the first step towards water appropriations from Springs Nos. 1 and 2, and it dated the appropriations as of September 27, 2000. Applying the two first step prongs, the water court found that Stucker Mesa, through its employees, entered onto Stucker Mesa's easement and Vought's property, in order to check for a pipeline leak and examine the springs for the purpose of appropriating the water into its system for the benefit of Stucker Mesa's shareholders, including Vought. The first inspection was on September 26, 2000. On September 27, 2000, Wolcott returned to determine the location of the point of diversion through a GPS reading, with the help of his son, a trained GIS consultant.
As the evidence shows, the springs were visible from the pipeline easement that Stucker Mesa had across Vought's property; Stucker Mesa could readily tie a collection device and diversion pipe from the springs into its water system; it had customers including Voughtwho could use the water developed by Stucker Mesa from the springs for domestic use; and it took all reasonable actions not to disturb Vought's property while also performing the overt acts required for completing the first step in appropriating water from the springs and preparing its water rights applications.
While Stucker Mesa's acts on the ground demonstrate Stucker Mesa's intent to appropriate the water of the springs for domestic use and constitute a substantial step towards placing the water to a beneficial use, given the small amount of water involved and Stucker Mesa's role as a local domestic water supplier to properties such as Vought's, none of Stucker Mesa's acts provided the requisite inquiry notice to other appropriators of its intent to appropriate the water. Location of a point of diversion through the use of a GPS device is an acceptable method for fixing the point of the proposed diversion for purposes of a conditional appropriation, but it leaves nothing on the ground for other appropriators to notice. See Bar 70, 703 P.2d at 1308. The requisite inquiry notice to other interested appropriators of the nature and scope of its appropriation did not occur until Stucker Mesa filed its conditional water rights applications on October 6, 2000. See Thornton, 830 P.2d at 926.
We hold that the water court correctly determined that the second visit to the site, when the GPS location was fixed, manifested Stucker Mesa's intent to appropriate the water from the springs for beneficial use and *917 constitutes a substantial step toward appropriation, but the water court incorrectly determined that the visit is sufficient to place other appropriators on inquiry notice of the nature and scope of the appropriation. Stucker Mesa first gave the requisite inquiry notice when it filed its water court applications. As a matter of law, Stucker Mesa's date of appropriation is October 6, 2000, the first date on which Stucker Mesa's overt acts coalesced to fulfill the three required functions of the second prong of the first step test.

3.

Application of the Can and Will Doctrine
Vought contends that Stucker Mesa failed to prove that it can and will complete the appropriation for the springs because the company did not have a right of access across Vought's property to the springs. We affirm the water court's finding that Stucker Mesa established that it can and will appropriate the water from the springs for beneficial domestic use diligently and within a reasonable time.
Stucker Mesa proved that it has the need and ability to construct the water works necessary for the appropriation, invoking the right of private condemnation to access the springs for diversion and conveyance of the water. See Gibbs, 856 P.2d at 803. The water company has a present need for more water for its tap owners, including Vought, and it owns a pipeline crossing Vought's property several hundred feet from the springs. Stucker Mesa established that it can and will complete the appropriation with diligence and apply the water to a beneficial use within a reasonable time.
Therefore, we affirm the water court's conclusion that Stucker Mesa met the can and will test for a conditional appropriation.

C.

Refusal to Dismiss Stucker Mesa's Applications
Next, Vought appeals the water court's decision not to dismiss Stucker Mesa's applications because of an alleged trespass.
First, the water court did not find the Stucker Mesa employees to be in trespass. Specifically, the evidence shows that the Stucker Mesa employees were validly within the fenced areas of Vought's property and the springs were in plain view from Stucker Mesa's pipeline easement. Further, the evidence shows that Stucker Mesa is a non-profit corporation dedicated to providing adequate, dependable water to its shareholders, including Vought. Stucker Mesa currently lacks sufficient water for all of its current customers and, at times, is required to limit use, so the company was acting in the best interests of its shareholders and tap owners by seeking additional sources of water.
Because Vought is a tap owner and shareholder in Stucker Mesa, he will benefit from any water rights obtained by Stucker Mesa. In addition to benefiting from addition of the water to the Stucker Mesa supply system, Vought will be compensated for any interest in his property that Stucker Mesa requires to complete the appropriation.
Consequently, we affirm the trial court's ruling refusing to dismiss Stucker Mesa's applications and finding that Stucker Mesa completed the first step towards an appropriation from Springs Nos. 1 and 2, but we correct the appropriation date to correspond with the evidence.

III.
Accordingly, we affirm the water court's conditional water rights decree for Vought, with an appropriation date of October 23, 2000, the date of his application. We reverse the water court's holding awarding Stucker Mesa conditional water rights with an appropriation date of September 27, 2000. As a matter of law, based on the evidence of record in the case, Stucker Mesa's appropriation date is October 6, 2000. The adjudication date for each of these appropriations is the calendar year 2000. Under both the Vought and Stucker Mesa case facts, the required inquiry notice to other appropriators did not occur until the applications were filed with the water court.
NOTES
[1] Vought lists the following issues on appeal:

1. Did the Water Court err in finding that the overt acts of monumentation of the points of diversion (staking of the springs) and construction activities (earthmoving to improve access to the points of diversion), performed by Appellant's ranch foreman, were insufficient to provide notice of an appropriation of water so as to constitute the first step of a conditional water right appropriation?
2. Did the Water Court err in finding that a trespass by a private water company official and his son, for the purpose of obtaining global positioning system coordinates without any monumentation or physical disturbance of the land, provided adequate notice [of] an appropriation of water so as to constitute the first step of a conditional water right appropriation?
3. Did the Water Court err in finding that a conditional water right knowingly initiated in trespass upon private property is not void or voidable as against public policy?
4. Did the Water Court err in granting conditional water rights based upon a finding that a private water company could and would complete the appropriation for springs located upon Appellant's property where the private water company was without an existing right of access or the ability to obtain such right of access.
[2] Water from springs is presumed to be tributary for purposes of the prior-appropriation doctrine, but the landowner has a preference for use of water for springs arising on his land if the water is non-tributary. See Ranson v. City of Boulder, 161 Colo. 478, 483, 424 P.2d 122, 123 (1967); § 37-82-102, 10 C.R.S. (2002)(landowner preference to water from natural springs on his property); § 37-82-103, 10 C.R.S. (2002)(water of tributary natural springs is subject to the prior-appropriation doctrine).
[3] Stucker Mesa characterized the water sources as two springs: Big Dripper Spring and Little Dripper Spring. Vought characterized the same water sources as three springs: Vought Spring No. 1, Vought Spring No. 2, and Vought Spring No. 3. Throughout this opinion, we refer to the springs as Springs Nos. 1, 2, and 3.
[4] Stucker Mesa has developed a prioritization system that limits specific water uses in times of shortage. Also, the company has not granted a new tap since 1980, and the last six taps granted were under the condition that their water would be cut off in times of extreme shortage.
[5] This court has direct appellate review of water court adjudications pursuant to Colo. Const. art. VI, § 2(2), section 13-4-102(1)(d), 5 C.R.S. (2002), and C.A.R. 1(a)(2). Park County Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262, 265 n. 2 (Colo.1999).
[6] In Bar 70, we found the applicant's field survey to be far short of providing required notice.

Tosco's field crew visited the general site of the proposed Miller Creek diversion only once, leaving nothing there that would indicate their inspection or the nature and purpose of their trip. No survey stakes or lines were set, no signs were posted near the site of the proposed diversion, and no notices were filed in the local newspapers. The field crew's activities, which consisted of taking notes and photographs, were not sufficient to alert any person who might fortuitously have been present at or near the site of the nature and scope of Tosco's contemplated diversion; nor, for that matter, were they sufficient to place an observer even on inquiry notice of Tosco's intent to appropriate any water at all. Indeed, if preliminary reconnaissance work of this type is permitted to satisfy the overt acts requirement, the notice function of that requirement for all practical purposes would be eliminated.
Bar 70, 703 P.2d at 1308 (emphasis added).