Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 8, 2020

## 2020 CO 50

**No. 19SA106, *Jacobs v. People*—Summary Judgment Certification—Summary Judgment Orders—Water Storage—Civil Penalties.**

In this appeal from a number of orders of the water court, defendants contend that the water court erred in (1) granting summary judgment for plaintiffs and partial summary judgment for the third-party defendant; (2) imposing civil penalties for defendants' violations of an administrative order requiring them to cease and desist unlawfully storing state waters in two ponds on their properties; and (3) certifying its summary judgment rulings as final pursuant to C.R.C.P. 54(b).

The supreme court concludes that the water court properly exercised its discretion in certifying its summary judgment orders pursuant to C.R.C.P. 54(b) and thus this appeal is properly before the court. The court next concludes that the water court properly granted both plaintiffs' summary judgment motion and the third-party defendant's motion for partial summary judgment because the summary judgment record established, as a matter of law, that (1) defendants did

not comply with the administrative order requiring them to cease and desist the unlawful storage of water in the ponds on their properties and (2) the third-party defendant did not breach an agreement between it and defendants that defendants claim satisfied their obligations under the administrative order. Last, the supreme court concludes that the water court properly imposed civil penalties under section 37-92-503(6)(a)(II), C.R.S. (2019).

Accordingly, the supreme court affirms the judgment of the water court, concludes that both plaintiffs and the third-party defendant are entitled to an award of the reasonable attorney fees that they incurred in this appeal, and remands this case to the water court to allow that court to determine the amount of fees to be awarded.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

---

**2020 CO 50**

---

**Supreme Court Case No. 19SA106**
*Appeal from the District Court*
Pueblo County District Court, Water Division 2, Case No. 17CW3038
Honorable Larry E. Schwartz, Water Judge

---

**Plaintiffs-Appellees:**

The People of the State of Colorado ex rel. Kevin G. Rein, State Engineer, and
Steve J. Witte, Division Engineer for Water Div. No. 2,

v.

**Defendants and Third-Party Plaintiffs-Appellants:**

Steven J. Jacobs, Jr., in his individual capacity; Casas Limited Partnership #4, a
Colorado Limited Partnership; and IQ Investors, LLC, a Colorado Limited
Liability Company,

v.

**Third Party Defendant-Appellee:**
Park Forest Water District

---

**Judgment Affirmed**
*en banc*
June 8, 2020

---

**Attorneys for Plaintiffs-Appellees:**
Philip J. Weiser, Attorney General
Christopher R. Stork, Assistant Attorney General
Paul L. Benington, First Assistant Attorney General
*Denver, Colorado*

**Attorneys for Defendants and Third-Party Plaintiffs-Appellants:**
Sherman and Howard L.L.C.
Stephen A. Hess
    *Colorado Springs, Colorado*

Carlson, Hammond & Paddock, LLC
Karl D. Ohlsen
    *Denver, Colorado*

**Attorney for Third-Party Defendant-Appellee:**
MacDougall & Woldridge, P.C.
Julianne M. Woldridge
    *Colorado Springs, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE SAMOUR** concurs in part and concurs in the judgment in part.

¶1 In this appeal from a number of orders of the water court, Dr. Steven Jacobs, Casas Limited Partnership #4, LLP, and IQ Investors, LLC (collectively, "Jacobs") contend that the water court erred in (1) granting summary judgment for the State Engineer and the Division Engineer for Water Division No. 2 (the "Engineers") and partial summary judgment for the Park Forest Water District ("PFWD"); (2) imposing civil penalties for Jacobs's violations of the Division Engineer's order requiring Jacobs to cease and desist unlawfully storing state waters in two ponds on his properties; and (3) certifying its summary judgment rulings as final pursuant to C.R.C.P. 54(b).

¶2 Because the issue pertains to our jurisdiction to hear this appeal, we conclude first that the water court properly exercised its discretion in certifying its summary judgment orders pursuant to C.R.C.P. 54(b). Accordingly, this appeal is properly before us. Next, we conclude that the water court properly granted both the Engineers' summary judgment motion and PFWD's motion for partial summary judgment because the summary judgment record established, as a matter of law, that (1) Jacobs did not comply with the Division Engineer's order to cease and desist the unlawful storage of water in the ponds on his properties and (2) PFWD did not breach a so-called Inclusion Agreement between it and Jacobs. Last, we conclude that the water court properly imposed civil penalties under section 37-92-503(6)(a)(II), C.R.S. (2019).

3

¶3 Accordingly, we affirm the judgment of the water court, conclude that both the Engineers and PFWD are entitled to an award of the reasonable attorney fees that they incurred in this appeal, and remand this case to the water court to allow that court to determine the amount of fees to be awarded.

## I. Facts and Procedural History

¶4 In 2012, Casas and IQ Investors acquired certain real properties, together with associated water rights and three ponds, in unincorporated El Paso County. Dr. Jacobs is, through a corporation, the manager of IQ Investors, and he is a general partner of Casas.

¶5 In order to satisfy the water needs of the properties, Jacobs negotiated with PFWD to join the properties to PFWD, and these parties formalized their arrangement in an Inclusion Agreement. Under paragraph 8 of this Agreement, PFWD agreed to add the ponds to its plan for augmentation, provide replacement/augmentation water sufficient to maintain the ponds "at a full stage," and augment depletions resulting from surface evaporation. The Agreement further provided that, with the exception of the above-noted requirement to provide augmentation water and the obtaining of a decree from the water court allowing PFWD to do so, "nothing in this Agreement shall require or otherwise obligate [PFWD], at any time or for any other purpose, to provide fill or re-fill water to the Existing Ponds."

4

¶6 Pursuant to the Inclusion Agreement, PFWD filed an application seeking to amend its augmentation plan to add Jacobs's ponds to it. In seeking this amendment, PFWD made clear that it was not requesting new water storage rights for the ponds but rather was simply proposing to replace evaporative losses from them. The water court granted PFWD's application and ruled that the ponds would be augmented consistent with the requirements of PFWD's augmentation plan.

¶7 Shortly thereafter, the water commissioner wrote to Jacobs to determine the status of an initial fill of two of the three ponds on Jacobs's properties, which had occurred sometime previously, after the two ponds were drained for reconstruction work. Specifically, the commissioner stated his understanding that the augmentation plan only provided for the replacement of evaporative losses and did not provide for an initial fill after draining. The commissioner reminded Jacobs of his obligation to provide for a legal initial fill and stated that although Jacobs's attorney had indicated that PFWD was going to provide the initial fill from its excess return flow credits, the commissioner had not received confirmation that the credits were purchased for that initial fill. Suspecting that the initial fill after reconstruction was thus not legally obtained, the commissioner requested that Jacobs provide him with the source of the initial fill and advised

that if he did not receive such confirmation, then he would seek an order requiring the release of any illegally stored water.

¶8 Discussion of this issue apparently went on for more than a year. In the course of such discussions, Jacobs took the position that the Inclusion Agreement covered the initial fill. PFWD, however, contended that that Agreement did not do so and that PFWD was not obligated to provide replacement water for the ponds.

¶9 On December 23, 2016, having not received satisfactory proof that Jacobs's initial fill of the ponds was lawful, the Division Engineer issued an administrative order (the "2016 Order") to Jacobs pursuant to section 37-92-502(3), C.R.S. (2019), which empowers a division engineer to order the release from storage of illegally or improperly stored water. The 2016 Order required, within thirty days of receipt, that Jacobs permanently cease and desist the storage of state waters within the ponds and prepare a plan for draining the ponds by April 1, 2017. Alternatively, the 2016 Order required that by April 1, 2017, Jacobs either provide for legally obtained return flow credits from PFWD or apply to the State Engineer's Office for approval of a substitute water supply plan to use any other legally obtained water source capable of delivering water to the Cottonwood Creek drainage upstream of the subject ponds.

6

¶10 Jacobs did not comply with the 2016 Order by the deadline set forth therein. The Engineers thus filed a complaint in the water court for injunctive relief, penalties, and costs to enforce the 2016 Order. Several months of unsuccessful settlement negotiations ensued, after which the Engineers filed a motion for a preliminary injunction to compel Jacobs to comply with the 2016 Order.

¶11 As the case between the Engineers and Jacobs unfolded, Jacobs filed a third-party complaint against PFWD in the water court, and Casas and IQ Investors filed a separate complaint against PFWD in the El Paso County District Court. Both of these complaints alleged that PFWD had breached the Inclusion Agreement in a number of ways. In addition, in the water court proceeding, Jacobs sought a declaratory judgment setting forth the rights and obligations of the parties regarding, among other things, "[t]he extent to which PFWD is obligated under the Inclusion Agreement to provide water to fill the ponds on [Jacobs's] property." PFWD denied breaching the Inclusion Agreement, and, in the water court case, it filed a counterclaim seeking rescission of the Inclusion Agreement on grounds unrelated to the fill issue. The El Paso County District Court subsequently stayed the complaint before it, pending the resolution of the claims in the water court, in order to avoid the potential for conflicting jurisdiction between the two courts.

¶12 In the briefing that followed in the water court, Jacobs asserted that the Inclusion Agreement was unambiguous and that its plain language required PFWD to provide augmentation for, or water to fill or re-fill, Jacobs's ponds after they were drained for reconstruction. The Engineers, in contrast, argued that the Inclusion Agreement did not obligate PFWD to fill or re-fill the ponds beyond filling to replace evaporative losses.

¶13 The water court subsequently held an evidentiary hearing on the Engineers' motion for a preliminary injunction. At this hearing, the parties presented conflicting testimony regarding the meaning of paragraph 8 of the Inclusion Agreement. As pertinent here, the water commissioner testified that the 2016 Order was issued because the commissioner had determined that Jacobs had no decreed right to fill the ponds after they had been drained for construction and therefore the water was being unlawfully stored in those ponds. The commissioner further testified, based on his experience and understanding, that paragraph 8 of the Inclusion Agreement did not provide a legal basis for the re-fill because when one maintains a storage vessel "at a full stage," which is what the Agreement required, "it's already been full or legally filled and typically an augmentation plan or other source that can be legally used to maintain it full replaces the evaporative losses of a pond." Accordingly, maintaining a vessel "at a full stage" did not mean more than filling to make up for evaporative depletions.

¶14 Dr. Jacobs also testified, and he disagreed with the commissioner. In his view, the language in paragraph 8 of the Inclusion Agreement stating that PFWD "shall provide replacement/augmentation water sufficient to maintain the Existing Ponds at a full stage" meant that PFWD would provide the water so that the ponds would be full. Dr. Jacobs testified to his belief that PFWD was going to provide the initial fill from its excess return flow credits.

¶15 In a detailed written order, the court granted the Engineers' request for a preliminary injunction. In support of this ruling, the court found that (1) at the time of the filling of the ponds after they had been drained, Jacobs had no lawful right to store water in the ponds beyond filling the ponds to replace evaporative losses; (2) downstream senior water rights were in need of water at the time of Jacobs's re-filling of the ponds in excess of filling to replace evaporative losses; (3) Jacobs lacked any decreed water right priorities for storage in the ponds or any decreed augmentation plan or temporary substitute water supply plan approved by the State Engineer to allow him to store water out of priority; (4) paragraph 8 of the Inclusion Agreement did not confer any obligation on PFWD to fill or re-fill the ponds beyond filling to replace evaporative depletions; and (5) Jacobs therefore had unlawfully stored water in the ponds. In light of these findings, the court concluded that not only had the Engineers shown a reasonable probability of success on the merits, but also they had succeeded on the merits. The court thus

9

ordered Jacobs to cease and desist all storage or retention of water in the ponds and to submit a drainage plan to the Division Engineer for his approval. Jacobs subsequently complied with this order.

¶16 In light of the court's preliminary injunction ruling, the Engineers then filed a motion for summary judgment, and PFWD filed a motion for partial summary judgment.

¶17 In their motion, the Engineers asked the court to rule, as a matter of law, that the 2016 Order was a valid order under section 37-92-502(3) and that Jacobs had violated and continued to violate the 2016 Order. In addition, the Engineers asked the court to impose civil penalties of up to $230,000 under section 37-92-503(6)(a)(II) and to award the Engineers their costs and reasonable attorney fees under sections 37-92-503(1)(b) and (6)(e).

¶18 The court ultimately granted the Engineers' motion. As pertinent here, the court determined that Jacobs's retention of the water in the ponds met the statutory definition of a diversion in section 37-92-103(7), C.R.S. (2019), and was also a diversion for purposes of section 37-92-503(6)(a)(II), which allows for the imposition of civil penalties for diversions contrary to a valid order of the State or a Division Engineer. The court thus concluded that the imposition of civil penalties under section 37-92-503(6)(a)(II) was "proper and required by the statutory language '**shall forfeit and pay . . . for each day such violation**

10

**continues**.'" (Quoting section 37-92-503(6)(a)(II); emphases in original.) In addition, the court concluded that the plain language of sections 37-92-503(1)(b) and 37-92-503(6)(e) authorized the imposition of costs and reasonable attorney fees against Jacobs. The court thus ordered Jacobs to pay civil penalties in the amount of $200 per day for the 460 days in which he did not comply with the 2016 Order (for a total of $92,000) and awarded costs and fees to the Engineers.

¶19 In PFWD's motion for partial summary judgment, PFWD asked the court to conclude, as a matter of law, that the plain language of the Inclusion Agreement did not obligate PFWD to provide water for or augment depletions from Jacobs's ponds beyond evaporative losses and that it specifically did not obligate PFWD to provide water for or augment depletions caused by filling or re-filling Jacobs's ponds. PFWD further asked the court to rule, as a matter of law, that it did not breach the Inclusion Agreement.

¶20 The court ultimately granted PFWD's motion. In so ruling, the court noted that the contents of the Inclusion Agreement were undisputed and that both sides agreed that the language in paragraph 8 was unambiguous. The court then construed paragraph 8, taking into consideration the words used (including the fact that "to maintain . . . at a full stage" was a trade term or standard of the community) and the terms of the amended augmentation decree. The court concluded, as a matter of law, that PFWD was not obligated to augment depletions

11

from Jacobs's ponds beyond evaporative losses and thus PFWD did not breach the Inclusion Agreement.

¶21 The Engineers and PFWD then separately moved for entry of final judgment on both of their summary judgment orders pursuant to C.R.C.P. 54(b). The court granted both motions.

¶22 With respect to the Engineers' motion, the court noted that (1) the summary judgment order was final and constituted the ultimate disposition of the Engineers' claims for relief; (2) there was no just reason for delay of entry of a final judgment as to such claims; and (3) judicial administration would not be hindered by entry of a final judgment.

¶23 With regard to PFWD's motion, the court found that between the order granting the Engineers' motion for summary judgment and the order granting partial summary judgment in PFWD's favor, there was now a complete adjudication of all claims in the matter before it except for PFWD's counterclaim against Jacobs. As to that counterclaim, the court noted that it was independent of the resolved claims, stood on its own, and could be prosecuted independent of the other claims. The court also found that certifying the partial summary judgment order as final would benefit judicial administration because it would assist in promoting the resolution of the identical claims that Casas and IQ

Investors had filed against PFWD in the El Paso County District Court, which claims had been stayed pending the outcome of the present proceeding.

¶24 Jacobs now appeals both the C.R.C.P. 54(b) certifications of the summary judgment orders and the merits of those orders.

## II. Analysis

¶25 Because the issue relates to our jurisdiction, we begin by considering whether the water court properly certified the above-described summary judgment orders as final pursuant to C.R.C.P. 54(b). Concluding that it did, we proceed to the merits of those orders and determine that the court properly granted summary judgment for the Engineers and partial summary judgment for PFWD. We then consider whether the water court correctly imposed civil penalties on Jacobs pursuant to section 37-92-503(6)(a)(II), and we conclude that it did and in a proper amount. Last, we address the Engineers' and PFWD's requests for an award of appellate attorney fees. We conclude that the Engineers are entitled to such an award pursuant to section 37-92-503(6)(e) and that PFWD is entitled to such an award under the Inclusion Agreement.

## A. C.R.C.P. 54(b) Certifications

¶26 C.R.C.P. 54(b) provides, in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties

13

only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

¶27 To determine whether to issue a C.R.C.P. 54(b) certification, a court must engage in a three-step process and conclude that: (1) the decision certified constitutes a ruling on an entire claim for relief; (2) the decision certified is final in terms of the ultimate disposition of an individual claim; and (3) there is no just reason for delay in the entry of final judgment on the claim. *Lytle v. Kite*, 728 P.2d 305, 308 (Colo. 1986). In deciding whether just reasons exist to delay an appeal of an individual final judgment, a court must consider both the interests of judicial administration and the equities involved. *Id.* at 309.

¶28 We review the first two prongs of the above-described test de novo, but the third prong—whether there is no just reason for delay—"is committed to the trial court's sound discretion." *Id.* at 308. "Once the concerns of sound judicial administration have been met, the discretionary judgment of the district court should be given substantial deference, 'for that court is the one most likely to be familiar with the case and with the justifiable reasons for delay.'" *Id.* at 309 (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980); additional internal quotation marks omitted). An appellate court will conclude that a trial court abused its discretion in certifying a judgment as final under C.R.C.P. 54(b) only when its ruling is manifestly arbitrary, unreasonable, unfair, or based on an erroneous view of the law. *Allison v. Engel*, 2017 COA 43, ¶ 25, 395 P.3d 1217, 1223.

14

¶29     With respect to the certification of the order granting PFWD's motion for partial summary judgment, Jacobs contends that the certification was improper because PFWD's counterclaim for rescission of the Inclusion Agreement is still at issue, as is the remainder of his declaratory judgment claim. Jacobs argues that because the court's partial summary judgment order resolved the interpretation and application of only one section of the Inclusion Agreement, the court's certification of that order will result in separate appeals over different parts of the agreement, contrary to C.R.C.P. 54(b)'s purpose of avoiding "piecemeal" litigation. *See Harding Glass Co. v. Jones*, 640 P.2d 1123, 1127 (Colo. 1982) ("The purpose of requiring that an entire claim for relief be finally adjudicated before Rule 54(b) certification is proper is to avoid the dissipation of judicial resources through piecemeal appeals.").

¶30     The water court rejected this argument, finding that the partial summary judgment ruling, when coupled with the summary judgment for the Engineers, adjudicated Jacobs's claims against PFWD in their entirety and ultimately disposed of them. The court further found that PFWD's counterclaim is "independent of the other claims of the parties in this case, stands on its own, and can be prosecuted independent of the other claims." And the court found that there was no just reason for delay because finalization would (1) assist in resolving the potential for conflicting jurisdiction between this case and the stayed

15

proceeding in the El Paso County District Court, (2) allow for the resolution of the identical claims in that court, and (3) prevent a collateral attack on jurisdiction over the counterclaim in the water court.

¶31 In our view, each of these findings and conclusions was amply supported by the record and reflected a proper exercise of the water court's discretion. The remaining allegations in Jacobs's declaratory judgment motion and of PFWD's counterclaim concern Jacobs's alleged failure to subdivide the property at the appropriate time, and all of those allegations are wholly independent of the claims regarding the meaning of paragraph 8 of the Inclusion Agreement. Moreover, the partial summary judgment order completely disposed of Jacobs's breach of contract and declaratory judgment claims regarding the meaning of paragraph 8 of the Inclusion Agreement. And sound judicial administration and the equities of this case favored certification because certification would permit resolution of the stayed, identical proceeding in the El Paso County District Court on issue preclusion grounds, while avoiding a collateral attack on the water court's jurisdiction. *See Lytle*, 728 P.2d at 309; *see also Foster v. Plock*, 2017 CO 39, ¶ 13, 394 P.3d 1119, 1123 (noting the elements of issue preclusion). Accordingly, we conclude that the water court properly certified the order granting partial summary judgment in PFWD's favor under C.R.C.P. 54(b).

¶32    With respect to the certification of the order granting the Engineers' motion for summary judgment, it is undisputed that that order fully resolved all claims in this case involving the Engineers.  Jacobs contends, however, that the water court abused its discretion in certifying this order because certification of the partial summary judgment in PFWD's favor was improper and the substantive issues regarding the Engineers' claims and the claims involving PFWD are so intertwined that certification of the summary judgment order in the Engineers' favor was therefore also improper.  We are not convinced.

¶33    As we understand Jacobs's argument, it is premised on his view that the certification of the partial summary judgment order in PFWD's favor was improper.  We, however, have already rejected that premise.  Accordingly, Jacobs's challenge to the C.R.C.P. 54(b) certification of the order granting summary judgment for the Engineers likewise fails.

¶34    We are not persuaded otherwise by Jacobs's apparent view that in certifying the judgment here, the water court did not make sufficient findings to establish that there was no just reason for delay.  Although it might have been preferable for the water court to set forth its reasoning more precisely in its certification order, the record makes clear that the court discerned no just reason for delay because it viewed the Engineers' claims and the claims involving PFWD as separately justiciable.  For example, in its order granting the Engineers' motion for a

preliminary injunction, the water court noted that private contracts do not relieve the Engineers of their statutory duty to administer, distribute, and regulate waters of the state. *See, e.g., City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 97 (Colo. 1996) (noting that the provisions of a decree do not prevent the State Engineer's office from taking additional action to fulfill its statutory duty to protect downstream users and that compliance with contractually imposed standards does not necessarily relieve a contracting party of its duty to comply with statutory requirements). The court thus concluded, "Because the Engineers do not administer water rights based on agreements like the Inclusion Agreement the Defendants have offered as their sole defense, the meaning of the Inclusion Agreement is not relevant as to whether [Jacobs] violated the valid Order of the Division Engineer."

¶35 Although the water court did not reiterate this reasoning in its C.R.C.P. 54(b) certification order, the record amply reflects the court's position, which it maintained throughout this case, and this reasoning supports the court's finding that there was no just reason for delay in the certification of the Engineers' order.

¶36 For these reasons, we perceive no abuse of discretion in the court's decision to certify, pursuant to C.R.C.P. 54(b), the court's order granting summary judgment for the Engineers.

¶37    Accordingly, we conclude that this appeal is properly before us, and we turn next to Jacobs's arguments on the merits.

## B.  Summary Judgment Orders

¶38    Jacobs contends that the Inclusion Agreement between him and PFWD established that he had provided for legally obtained return flow credits from PFWD.  Accordingly, he asserts that the water court erred in granting PFWD's motion for partial summary judgment, which was directed to the proper interpretation of the Inclusion Agreement.  And because Jacobs believes that the water court improperly interpreted the Inclusion Agreement and that a proper interpretation showed that he had provided for legally obtained return flow credits, Jacobs further argues that he did not violate the 2016 Order and that therefore the water court erred in granting the Engineers' motion for summary judgment.  Again, we are unpersuaded.

¶39    Because Jacobs's assertion that the water court erred in granting the summary judgment motions at issue turns on his interpretation of paragraph 8 of the Inclusion Agreement, we begin with that issue, addressing first the applicable legal standards.

## 1.  Standard of Review Regarding Summary Judgment Orders

¶40    We review an order granting summary judgment de novo.  *Dep't of Revenue v. Agilent Techs., Inc.*, 2019 CO 41, ¶ 15, 441 P.3d 1012, 1016.  Summary

judgment is only proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *accord Agilent Techs., Inc.*, ¶ 15, 441 P.3d at 1016.

¶41 In considering whether summary judgment is appropriate, a court grants the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolves all doubts against the moving party. *Agilent Techs., Inc.*, ¶ 15, 441 P.3d at 1016. In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on mere allegations or demands in its pleadings but rather must provide specific facts demonstrating a genuine issue for trial. *Id.*

¶42 Summary judgment is a drastic remedy, and it should only be granted when it is clear that the applicable legal standards have been met. *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 21, 347 P.3d 606, 611.

## 2. Principles of Contract Interpretation

¶43 Contract interpretation also presents a question of law that we review de novo. *Klun v. Klun*, 2019 CO 46, ¶ 18, 442 P.3d 88, 92. In construing a contract, we interpret the contract in its entirety, seeking to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Copper Mountain, Inc. v.*

20

*Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). Our primary goal in contract interpretation is to determine and give effect to the intent of the parties. *Klun*, ¶ 18, 442 P.3d at 92. We determine the parties' intent primarily from the language of the instrument itself. *Id.* When a written contract is complete and free from ambiguity, we will conclude that it expresses the intent of the parties, and we will enforce it according to its plain language. *Id.* In ascertaining whether provisions of an agreement are ambiguous, we review the instrument's language and construe it consistent with the plain and generally accepted meaning of the words employed. *Id.* In addition, "[w]hen parties are engaged in a trade or technical field, '[u]nless a different intention is manifested . . . technical terms and words of art are given their technical meaning when used in a transaction within their technical field.'" *Bledsoe Land Co. v. Forest Oil Corp.*, 277 P.3d 838, 843 (Colo. App. 2011) (quoting Restatement (Second) of Contracts § 202(3)(b) (Am. Law. Inst. 1981)); *see also Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 833–34 (10th Cir. 2005) (considering the "specialized meaning of 'cleared' in the financial industry" when interpreting a contract between providers of financial services).

¶44    Contract terms are ambiguous when they are reasonably susceptible of more than one interpretation. *Klun*, ¶ 19, 442 P.3d at 92. The mere fact that the parties interpret the agreement differently, however, does not alone establish an ambiguity in the agreement. *Id.* Absent such ambiguity, we will not look beyond

21

the four corners of the agreement to determine the meaning that the parties intended. *Id.*

### 3. The Inclusion Agreement

¶45 Jacobs and PFWD agree that paragraph 8 of the Inclusion Agreement is unambiguous, but they disagree as to the meaning of its terms. That paragraph provides, in pertinent part:

> *The Water District shall add the Existing Ponds to its plan for augmentation as augmented structures, and shall provide replacement/augmentation water sufficient to maintain the Existing Ponds at a full stage,* and to augment depletions resulting from surface evaporation . . . . The Existing Ponds will be operated consistent with the terms and conditions of the augmentation plan amendment, which shall be consistent with this Paragraph 8, and no additional ponds may be constructed on the Property without the Water District's prior written consent. *Excepting provision of augmentation water as provided in this Paragraph 8 and the obtaining of a decree from the Division 2 W[a]ter Court allowing the District to do the same, nothing in this Agreement shall require or otherwise obligate the Water District, at any time, or for any other purpose, to provide fill or re-fill water to the Existing Ponds . . . .*

(Emphases added.)

¶46 The evidence in the summary judgment record established that "at a full stage" is a term of art. Specifically, the water commissioner explained that in the field of water administration, when a document describes a duty to maintain a storage vessel "at a full stage," this means that the vessel has "already been full or legally filled and typically an augmentation plan or other source that can legally be used to maintain it full replaces the evaporative losses of a pond." This view

22

was fully consistent with the terms of the amended augmentation plan, which, as paragraph 8 of the Inclusion Agreement makes clear, governed the ponds' use. Indeed, as noted above, PFWD's application for the amendment to its augmentation plan noted that PFWD was not requesting new water storage rights for the ponds but rather was simply proposing to replace evaporative losses from them.

¶47 Jacobs offered no law or evidence to the contrary. Instead, relying on his subjective view as to what the term "at a full stage" meant, he merely noted his disagreement with the commissioner's testimony. This disagreement alone, however, is insufficient to establish either that the Inclusion Agreement is ambiguous or that we should refuse to apply the generally accepted meaning of the term "at a full stage." *See Klun*, ¶ 19, 442 P.3d at 92 (noting that the mere fact that the parties interpret an agreement differently does not alone establish an ambiguity in the agreement); *Agilent Techs., Inc.*, ¶ 15, 441 P.3d at 1016 (noting that in responding to a properly supported summary judgment motion, the nonmoving party may not rest on mere allegations in its pleadings but must provide specific facts demonstrating a genuine issue for trial); *Bledsoe Land Co.*, 277 P.3d at 843–45 (applying the generally accepted meaning of the term "completion of a well" in a dispute regarding an oil and gas lease when the parties manifested no intent to redefine that term).

¶48 In light of the foregoing, we conclude that paragraph 8 of the Inclusion Agreement is unambiguous, and applying that provision's plain language here, we further conclude that PFWD was obliged to replace only evaporative losses, and not to provide fill or re-fill water for the ponds after they had been drained. Indeed, paragraph 8 itself makes clear that nothing in the Inclusion Agreement "shall require or otherwise obligate the Water District, at any time or for any other purpose, to provide fill or re-fill water to the Existing Ponds." Jacobs's interpretation, in contrast, would render this provision meaningless. We, however, may not adopt such a construction. *See Copper Mountain, Inc.*, 208 P.3d at 697.

¶49 For these reasons, we conclude, as a matter of law, that the Inclusion Agreement did not provide Jacobs with a legal fill and re-fill source for the ponds as he contends. Nor did it obligate PFWD to augment depletions from Jacobs's ponds beyond evaporative losses. We thus further conclude that the water court properly granted PFWD's motion for partial summary judgment. And because the court correctly determined that the Inclusion Agreement did not establish the return flow credits or substitute water supply plan that the 2016 Order demanded, we conclude that the water court correctly determined, as a matter of law, that Jacobs had not complied with that Order, thereby warranting summary judgment on the Engineers' claims as well.

¶50 In reaching these conclusions, we decline Jacobs's invitation to consider the various redlined drafts of the Inclusion Agreement exchanged between the parties before that Agreement was signed. As noted above, the parties all agreed—as do we—that paragraph 8 of the Inclusion Agreement is unambiguous. Accordingly, we will not look beyond the Agreement's four corners to determine the meaning intended by the parties. *See Klun*, ¶ 19, 442 P.3d at 92.

## C. Civil Penalties

¶51 Jacobs next contends that the water court erred in imposing civil penalties on him and in determining that he was in violation of the 2016 Order for 460 days. Specifically, he asserts that under section 37-92-503(6)(a)(II), only improper diversions are subject to civil penalties, but that the improper storage of water is not. He further contends that if a penalty was authorized, then only his initial fill of the ponds was a violation and the imposition of a $92,000 penalty for this one-time misconduct constitutes an excessive penalty in violation of the Colorado and United States Constitutions. We disagree with each of these contentions.

## 1. Standard of Review

¶52 Jacobs's argument requires us to interpret several statutory provisions. We review questions of statutory interpretation de novo. *Agilent Techs., Inc.*, ¶ 16, 441 P.3d at 1016. In construing a statute, we aim to effectuate the legislature's intent. *Id.* "In doing so, we look to the entire statutory scheme in order to give

25

consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings." *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22, 408 P.3d 836, 840. Additionally, "[w]e must avoid constructions that would render any words or phrases superfluous or that would lead to illogical or absurd results." *Agilent Techs., Inc.*, ¶ 16, 441 P.3d at 1016. If the statutory language is clear, we will apply it as written, and we need not resort to other rules of statutory construction. *Id.*

## 2. Storage as Diversion

¶53 Jacobs argues that section 37-92-503(6)(a)(II), which authorizes the imposition of civil penalties in certain circumstances, only applies to illegal diversions of surface water, as opposed to the illegal storage of such water, and therefore the water court improperly assessed civil penalties against him. Specifically, his argument is as follows: Section 37-92-503(6)(a)(II) only authorizes civil penalties against persons who divert water contrary to a valid order of the State Engineer. Subsections 37-92-502(2) and -502(3), however, distinguish between orders related to diversions (-502(2)) and orders related to releases of stored water (-502(3)). Accordingly, the penalties provision in section 37-92-503(6)(a)(II), which refers to one who diverts water, applies only to violations of orders issued under subsection -502(2) and not to violations of orders

issued under subsection -502(3), as the 2016 Order here was. We are not persuaded by this argument.

¶54 Section 37-92-503(6)(a)(II) provides, "Any person who diverts surface water contrary to a valid order of the state engineer or a division engineer *issued pursuant to section 37-92-502* shall forfeit and pay a sum not to exceed five hundred dollars for each day such violation continues." (Emphasis added.) This provision, on its face, applies to *any* diversion of surface water contrary to a valid order of the State or Division Engineer issued pursuant to section 37-92-502.

¶55 "Diversion" or "divert" is defined, in pertinent part, as "removing water from its natural course or location, or controlling water in its natural course or location, by means of a control structure . . . or other structure or device." § 37-92-103(7). "[T]o effect a diversion under the statute, water either must be removed or it must be controlled." *City of Thornton ex rel. Utils. Bd. v. City of Fort Collins*, 830 P.2d 915, 930 (Colo. 1992). Moreover, "[a] dam certainly qualifies as a structure or device." *Id.*

¶56 Here, it is undisputed that the 2016 Order issued to Jacobs was issued pursuant to section 37-92-502. Moreover, the evidence in the summary judgment record shows that Jacobs retained and controlled surface water. Specifically, the record shows that the ponds have continuously controlled water in its natural course or location by means of a reservoir and dams, which are structures or

27

devices encompassed within the statutory definition of diversion. *See City of Thornton*, 830 P.2d at 930. Accordingly, by definition, Jacobs diverted surface water contrary to a valid order of the Division Engineer pursuant to section 37-92-502. Thus, under the plain language of section 37-92-503(6)(a)(II), the imposition of civil penalties was proper.

¶57 To conclude otherwise and to adopt Jacobs's construction of section 37-92-503(6)(a)(II) would have us draw a distinction between illegal diversions and illegal storage of water that the statute does not make. To the contrary, as noted above, the statute subsumes violations of all orders issued pursuant to section 37-92-502, and that section includes both illegal diversions and illegal storage of surface water. Moreover, distinguishing between the two for purposes of the civil penalties provision would lead to absurd results because under such a construction, no penalties could ever be imposed on a party who stores water illegally, no matter how long the party does so. We, however, must avoid such absurd results. *Agilent Techs., Inc.*, ¶ 16, 441 P.3d at 1016.

¶58 We are likewise unpersuaded by Jacobs's assertion that, if penalties may properly be assessed here, then only his initial fill constituted a violation of the 2016 Order, and therefore he was only in violation of the Order for one day. Jacobs's argument simply ignores the fact that for 460 days, he did not prepare and execute a plan for draining the ponds, nor did he provide for legally obtained

28

return flow credits from PFWD or apply to the State Engineer's office for approval of a substitute water supply plan. Jacobs further ignores the undisputed fact that, continually since 1999, there has been a call for water administered by the Engineers on the Arkansas River and that no "free river" conditions existed in 2014 or later that would have allowed the ponds to fill without depriving vested water rights of water to which they were entitled under decreed priorities. Accordingly, for every day that Jacobs did not release the water as he was ordered to do, he injured such decreed water rights.

¶59 Lastly, we are unpersuaded by Jacobs's argument that the $92,000 penalty constitutes an excessive penalty in violation of the Colorado and United States Constitutions.

¶60 A penalty is constitutionally excessive if it is grossly disproportionate to the gravity of the underlying offense. *Colo. Dep't of Labor & Emp't v. Dami Hosp., LLC*, 2019 CO 47M, ¶ 29, 442 P.3d 94, 101. In assessing proportionality, a court should consider "whether the gravity of the offense is proportional to the severity of the penalty, considering whether the fine is harsher than fines for comparable offenses in this jurisdiction or than fines for the same offense in other jurisdictions." *Id.* at ¶ 38, 442 P.3d at 103. In addition, a court should consider the regulated individual's or entity's ability to pay. *Id.* And "[w]hen a fine is imposed on a per diem basis, with each day constituting an independent violation, the evaluation of

whether a fine is excessive must be done with reference to each individual daily fine." *Id.* at ¶ 36, 442 P.3d at 103.

¶61 Here, section 37-92-503(6)(a)(II) specifically authorizes the Engineers to levy penalties of up to $500 "for each day such violation continues." § 37-92-503(6)(a)(II). Thus, we evaluate whether the penalties imposed are excessive on the basis of the individual daily imposition. *Dami Hosp.*, ¶ 36, 442 P.3d at 103. For several reasons, we conclude that the $200 daily penalty that the water court imposed here was not unconstitutionally excessive.

¶62 First, the statutory maximum penalty is $500 per day, and the daily penalty that the water court levied was well below that authorized maximum. § 37-92-503(6)(a)(II). Moreover, the $200 daily penalty appears to be commensurate with penalties levied for comparable conduct in Colorado. For example, section 37-92-503(6)(a)–(c) lists the civil penalties for violations of a variety of orders issued by the State Engineer, and each of those penalties is similarly capped at a maximum of $500 per day.

¶63 Second, the record here shows that the $200 per day penalty was not grossly disproportionate to the gravity of the underlying offense. *Dami Hosp.*, ¶ 29, 442 P.3d at 101. As noted above, there has been a continual call for water on the Arkansas River since 1999. Accordingly, for each day that Jacobs continued storing water in violation of the 2016 Order, he injured decreed water rights. In

30

addition, during part of the time in which Jacobs was illegally storing the water at issue, Colorado was in the midst of a severe drought. Particularly in this context, and given the over-appropriated nature of the stream system, we, like the water court, view Jacobs's failure to comply with the 2016 Order for as long as he did to constitute a serious violation warranting substantial penalties. For these reasons as well, we believe that the penalties imposed were commensurate with the gravity of Jacobs's violation.

¶64    Third, *Vaughn v. People ex rel. Simpson*, 135 P.3d 721 (Colo. 2006), on which Jacobs relies, does not assist him. In *Vaughn*, 135 P.3d at 722, a well on Vaughn's property had pumped approximately 6.2 million gallons of water after the division engineer had issued an order requiring Vaughn to discontinue diverting from that well. Division engineers calculated that if the well had been pumping twenty-four hours per day, then it would have taken 7.25 days to divert that amount of water. *Id.* Based on the foregoing, the water court imposed a penalty of $200 per day for each of these seven days, resulting in total penalties of $1,400, and we upheld those penalties. *Id.* at 721, 725.

¶65    Notwithstanding Jacobs's assertions to the contrary, *Vaughn* did not involve a $1,400 penalty for illegally pumping over a 153-day span. Rather, as noted above, it involved $1,400 in penalties for an approximately seven-day violation. Accordingly, *Vaughn* does not support Jacobs's assertion that the penalties here

31

were grossly disproportionate. To the contrary, the $200 per day penalty imposed in *Vaughn* matches the daily penalty imposed here. The only difference is that Vaughn's violation occurred over seven days, whereas Jacobs's violation spanned 460 days. We therefore perceive no conflict between *Vaughn* and the water court's order in this case.

¶66 Finally, Jacobs does not dispute his ability to pay the $200 daily penalty. Nor does he argue that the $200 penalty is excessive in comparison to penalties set forth in similar statutes in this jurisdiction or in other jurisdictions.

¶67 Accordingly, we conclude that the water court properly assessed penalties in the amount of $200 per day for the 460 days in which Jacobs was in violation of the 2016 Order, and we further conclude that these penalties were not constitutionally excessive.

## D. Appellate Attorney Fees

¶68 Finally, both the Engineers and PFWD assert that they are entitled to an award of the reasonable attorney fees that they incurred in this appeal. We agree.

¶69 With respect to the Engineers' request for appellate fees, section 37-92-503(6)(e) provides, in pertinent part:

> The state engineer and the particular division engineer . . . shall apply to the water judge of the particular division to recover the civil penalties specified in paragraphs (a), (b), and (c) of this subsection (6) . . . . If the state engineer and the division engineer prevail, the court shall also award the costs of the proceeding including the allowance of reasonable attorney fees.

¶70 Here, for the reasons discussed above, the Engineers prevailed in recovering the civil penalties that they sought. Accordingly, under the plain language of the above-quoted statute, we conclude that the Engineers are entitled to recover their costs, including reasonable appellate attorney fees.

¶71 With respect to PFWD's request for appellate fees, the Inclusion Agreement provides:

> Attorney's Fees. In the event of any dispute between the parties concerning this Agreement or in the event of any action to enforce this Agreement or to collect damages on account of any breach of the obligations provided for herein, *the prevailing party shall be entitled to recover from the other party all costs and expenses, including reasonable attorney's fees, incurred in such litigation* as well as all additional such costs and expenses incurred in enforcing and collecting any judgment rendered in such action.

(Emphasis added.)

¶72 Because this case involved a dispute concerning the Inclusion Agreement as well as an effort to enforce that Agreement, and because PFWD was unquestionably the prevailing party, we conclude that under the plain terms of the above-quoted contractual fee-shifting provision, PFWD is also entitled to an award of the reasonable attorney fees that it incurred in this appeal.

¶73 Pursuant to C.A.R. 39.1, we exercise our discretion to remand this case to the water court for a determination of the amount of reasonable appellate fees to be awarded.

33

## III. Conclusion

¶74 For the foregoing reasons, we conclude that the water court properly exercised its discretion in certifying its summary judgment orders pursuant to C.R.C.P. 54(b), and, thus, this appeal is properly before us. We further conclude that the water court properly granted both the Engineers' summary judgment motion and PFWD's motion for partial summary judgment because the summary judgment record established, as a matter of law, that Jacobs did not (1) comply with the 2016 Order to cease and desist his storage of state waters in the ponds; (2) establish that an Inclusion Agreement between him and PFWD provided for legally obtained return flow credits; or (3) apply to the State Engineer for a substitute water supply. Finally, we conclude that the water court properly imposed civil penalties under section 37-92-503(6)(a)(II).

¶75 Accordingly, we affirm the judgment of the water court, conclude that both the Engineers and PFWD are entitled to an award of the reasonable attorney fees that they incurred in this appeal, and remand this case to allow the water court to determine the amount of reasonable fees to be awarded.

**JUSTICE SAMOUR** concurs in part and concurs in the judgment in part.

JUSTICE SAMOUR, concurring in part and concurring in the judgment only in part.

¶76 With one exception, I agree with the majority opinion in its entirety. The exception is the majority's reliance on *Colo. Dep't of Labor & Emp't v. Dami Hosp., LLC*, 2019 CO 47M, 442 P.3d 94. Under *Dami*, when, as here, "a fine is imposed on a per diem basis, with each day constituting an independent violation, the evaluation of whether a fine is excessive must be done with reference to each individual daily fine." *Id.* at ¶ 36, 442 P.3d at 103. I wrote separately there because I disagreed "that the proportionality analysis must be conducted with regard to each individual per diem fine, as opposed to the total" or aggregate fine. *Id.* at ¶ 40, 442 P.3d at 104 (Samour, J., concurring in part and dissenting in part). I'm sticking with my conclusion in *Dami*. Thus, in determining whether the fine imposed on Jacobs is excessive in violation of the United States and Colorado Constitutions, I would focus on the $92,000 aggregate fine instead of the $200 per diem fine.

¶77 Rather than dissent in part, however, I concur in the judgment only in part because I would find that Jacobs's aggregate fine is proportional. For the persuasive reasons articulated by the majority in paragraphs 62 to 65 of its opinion, I would find that the $92,000 fine, while significant, is nevertheless constitutional.

¶78 Accordingly, I concur in part and concur in the judgment only in part.

1